**STANDARD EDUCATORS, INC. and James A. Melley, Sr., Petitioners**

**v.**

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 72–1164.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1972.

Decided March 9, 1973.

Ronald J. Wilson, Washington, D. C., for petitioners.

Nicholas S. Reynolds, Atty., Federal Trade Commission, with whom Harold D. Rhynedance, Jr., Asst. Gen. Counsel, Federal Trade Commission, was on the brief, for respondent.

Before WRIGHT and WILKEY, Circuit Judges, and RICHEY,* District Judge.

PER CURIAM:

■ This case is here on a petition to review an order of the Federal Trade Commission. The Commission directed its order against James A. Melley, Sr. in his individual capacity, as well as against the company, because it found that Melley knew of and approved many of the false and deceptive practices. Testimony before a hearing examiner showed that Melley was the organizer of the company, served as its president and treasurer, and owned 51 per cent of its stock. In the company's infancy he did much of the selling himself, and although at the time in question Melley no longer engaged in any selling himself, he still, in the words of the trial examiner, "spends his time in the office supervising the over-all operations * * *." In addition, he devised the form contract used by the company's salesmen, a contract whose provisions were an integral part of the deceptive scheme. All of these factors, combined with the uncontradicted proof of widespread instances of deceptive practices by company salesmen, support the Commission's finding that Melley knew of and approved the deceptive practices. *See* Fred Meyer, Inc. v. F.T.C., 9 Cir., 359 F.2d 351, 368 (1966).

The Commission introduced testimonial evidence as to 12 typical sales, dating from February 1965 to May 1968, taking place at sites as widespread as Oahu, Hawaii, Colorado Springs, Colorado, Groton, Connecticut, Portsmouth, New Hampshire, and Havre de Grace, Maryland.[1] The same oral misrepresentations were made in every one of these cases, and in each the pattern of deception was facilitated by the contract written by Mr. Melley. The Commission does not engage in speculation when it rejects the conclusion that these similarities occurred purely by coincidence and instead infers that they were the result of direction from above.

■ In drawing inferences about the knowledge of corporate officers in cases such as this, the Commission properly draws upon its expertise. And where it does so, our guiding principle in reviewing the Commission's findings of fact is Mr. Justice Black's statement for a unanimous Court in F.T.C. v. Standard Education Society,[2] 302 U.S. 112, 117, 58 S.Ct. 113, 116, 82 L.Ed. 141 (1937):

> "The courts do not have a right to ignore the plain mandate of the statute which makes the findings of the Commission conclusive as to the facts if supported by testimony. The courts cannot pick and choose bits of evidence to make findings of fact contrary to the findings of the Commission. * * *"

(Footnote omitted.)

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1970).

1. We might add, in response to the dissent's unwarranted characterization of these instances as "scattered misrepresentations," that petitioners' own counsel sought to limit the number of customer-witnesses that could be called by the Commission in order "to reduce the case to manageable and realistic proportions" and to avoid burdening petitioners.

2. It is interesting to note that, although the Standard Education Society is apparently not related to Standard Educators, Inc., the record does indicate that when he incorporated Standard Educators, Inc. Mr. Melley made arrangements with Standard Education Society to purchase its line of encyclopedias for resale to the public. Standard Education Society also provides the broadsides used by Standard Educators' salesmen in their sales presentations. In addition, the false and deceptive practices of Standard Educators, Inc. parallel in many respects the false and deceptive practices condemned in *Standard Education Society*, including: representing that encyclopedias are given away free or sold at a specially reduced price to selected persons in return for use of the purchaser's name for advertising; representing that the recipient pays only for purchase of a 10-year annual yearbook extension service; and representing that the recipient was getting a special combination offer not generally available.

In this case, the conclusion that Melley knew of and authorized the deceptive practices was amply supported by evidence of record. A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception.

The other issues raised by petitioners are without merit, and were dealt with at length in the Commission's careful, well reasoned opinion. Accordingly, the order of the Commission is

Affirmed.

WILKEY, Circuit Judge (dissenting):

The illegal practices alleged in this case were false and deceptive statements made by individual salesmen of Standard Educators, Inc., in connection with door-to-door sales of encyclopedias. I agree with the majority that substantial evidence supports the FTC's findings that such statements were made. I agree that the corporation, acting through its salesmen, violated the Federal Trade Commission Act.[1]

I cannot agree with the majority's affirmance of the Commission's decision to direct its cease and desist order against James A. Melley, Sr., in his individual capacity. The FTC and the majority repeatedly stress the existence of admitted violations by salesmen. That simply gets them nowhere on the issue of Mr. Melley's personal involvement, although it does, of course, support the FTC's decision against the corporation, with which I agree. As regards Mr. Melley, I find the Commission's opinion neither "careful" nor "well reasoned." To the contrary, it is unsupported and cavalier.

As the Commission itself notes in its opinion here, "[t]he rationale for subjecting respondents in their individual capacities to Commission orders is to assure that such orders will be fully effective in preventing the unlawful activities."[2] This rationale necessarily implies that some connection must be established between the individual respondent and the alleged unlawful practices. If a proven connection were unnecessary, the Commission could conceivably proceed to order each and every U.S. citizen or resident to cease all imaginable illegal practices within the FTC jurisdiction. The very nature as a "cease and desist" order implies that the named individual was at least indirectly involved in the past, or is likely to participate in the future, in the activities which the Commission wants stopped. In short, naming individual respondents in a case like this "is tantamount to a finding on the evidence that they have personally violated, or can be expected to violate . . ." the relevant statute. Flotill Products, Inc. v. FPC.[3]

Although the degree of personal involvement in the alleged violations which justifies individual direction of a cease and desist order has been variously articulated, mere ownership and control of an offending corporation, whose employees have committed the charged violations, is not enough.[4] Mr. Melley was in fact the majority shareholder, President, Treasurer, and Chairman of the Board of Standard Educators. However, a more specific and substantial connection *with the violations* must be (but was not) shown to justify the order issued against him here. Rather than establishing such a connection, the FTC's opinion, as it relates to Melley individually, ignores a highly experienced hearing examiner's findings, goes far beyond proper inference, engages in cynical and unwarranted speculation, and finds no support in the record.[5]

1. 15 U.S.C. § 45 (1964).

2. Appendix (hereafter "App.") at p. 200.

3. 358 F.2d 224, 233 (9th Cir. 1966).

4. See Flotill Products, Inc. v. FTC where reliance, in naming individuals in the order there, "on no other fact than that the three individuals owned and controlled the corporation" was accurately described as "rather cavalier." 358 F.2d 224, 233.

5. The hearing examiner specifically noted that "Complaint counsel did not point to

This is not a case in which a likelihood of future violations has been shown, for example, by evidence that the corporation involved was formed for the purpose of evading FTC orders. Compare FTC v. Standard Education Society et al.[6] Hardly a "fly by night" operation, Standard Educators, Inc., enjoyed a stable corporate existence since its founding in 1957. There is absolutely no evidence in the record to support a finding that Mr. Melley would attempt to play the "shell game."[7]

This is not a case in which the deceptive practices were so intertwined with company policy that the responsible corporate officers could be fairly deemed to have known of and approved the violations. Compare FTC v. Standard Education Society et al.[8] and Benrus Watch Company v. FTC.[9] To the contrary, the Commission proved only scattered misrepresentations perpetrated by individual salesmen.[10] The only evidence of central corporate policy came from Melley himself and was apparently credited by the hearing examiner. Mr. Melley testified that the company had a strong policy against misrepresentations and fired salesmen who were found to have engaged in deceptive practices.[11]

This is not a case in which widespread knowledge of the offenses in the community justified an inference that the corporate officers closely involved must also know of and approve the violations. Compare Fred Meyer, Inc., et al. v. FTC.[12] Mr. Melley did admit that he knew the company was receiving a "very minimum" number of customer complaints, "maybe one a month."[13] For a

any evidence—*and there is none in the record*—that Mr. Melley committed any illegal act in his individual capacity, or that Mr. Melley is likely to violate the act in the future in his individual capacity, or that he will attempt to evade any order which may be issued against the corporate respondent." App. at pp. 181–182 (emphasis added).

6. 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141 (1937).

7. The hearing examiner specifically noted that "[t]here is no evidence of record to indicate that the corporate entity is a sham or that Mr. Melley organized the corporation in an attempt to evade any order which may be issued . . . ." App. at p. 183.

8. The offense charged there involved a "well-matured" "general sales plan" "outlined in letters going directly from the companies." 302 U.S. 112, 115–117, 58 S.Ct. 113, 115, 82 L.Ed. 141 (1937).

9. 352 F.2d 313 (8th Cir. 1965). The violation charged concerned preticketing of merchandise. That practice was of the sort necessarily planned and supervised as a matter of company policy, and could hardly have originated with a frolic and detour by individual non-policymaking employees. Therefore, the fact that the officers involved "formulated, directed and controlled the policies and practices of the corporate respondents" was enough to justify individual direction of the cease and desist order. 352 F.2d 313, 324. See also Pati-Port, Inc. v. FTC, 313 F.2d 103 (4th Cir. 1963), where the individuals named had, on request from a subordinate, specifically approved the illegal practices.

10. Testimony was introduced concerning twelve sales at scattered sites during a period from February 1965 to May 1968. A dispersed pattern of abuse might well merely suggest that dishonest salesmen get around and pick up the tricks of their trade from each other. Even if central control is inferable, *who* sent directives from above would still not have been shown. Indeed, their widely scattered character could increase the chances that company headquarters would not learn of violations.

11. Mr. Melley testified that if salesmen "are caught in misrepresentation, they are fired." App. at p. 404.

12. 359 F.2d 351 (9th Cir. 1966), cert. denied, 386 U.S. 908, 87 S.Ct. 851, 17 L. Ed.2d 782 (1967). In that case, the court noted that "despite Meyer's denials of knowledge of the operations of his business, the Commission was justified in concluding that 'if "a majority of Portland's 120,000 families" were apprised of the details of these [deceptive] programs, we think it is a fair inference that the Chairman of the Board also knew about them.'" 359 F.2d 351, 368.

13. App. at p. 380.

company doing over $2,000,000 in sales to individual customers (in 1969), that level of customer dissatisfaction was hardly high enough to support an inference of knowledge of pervasive deceptive practices. Since Melley went on to explain how he sought to discipline salesmen and satisfy the complaining customers, an inference of approval of these abuses is even more far-fetched.

Even assuming that the illegal practices could or should have been known to those directing the company on a day-to-day basis, this is not a case in which personal knowledge could be fairly attributed to the individual officer actually named. Compare Coro, Inc. v. FTC.[14] While Melley was deeply involved in the corporation's early beginnings, he had almost completely withdrawn from routine supervision of its affairs at the time when the violations charged here occurred. The only evidence concerning his actual degree of involvement indicates that, while some important matters were occasionally brought to his attention, he didn't "seem to have too many duties any more,"[15] didn't "watch sales that closely,"[16] no longer hired or trained salesmen,[17] and in fact was so removed from the business that he did not even really know how many salesmen were actually employed.[18]

This is not a case in which documents distributed by the company, and used by salesmen, were themselves found to be deceptive. Compare Consumer Sales Corp. v. FTC[19] and Steelco Stainless Steel v. FTC.[20] There is absolutely no finding, nor could there be a reasonable one, that the contract used was on its face in any way misleading. This last point is highly significant because, when stripped of merely conclusory language, the Commission's opinion finding personal involvement appears to be based solely on the fact that Mr. Melley helped to draft the sales contract.

Although not finding the contract itself deceptive, the FTC and the majority here describe that document as "an integral part" of the deceptive sales practices challenged in the complaint.[21] The Commission concludes that it is "unlikely" that the form used could have been "supplied for any other *purpose*" than that of enabling and authorizing salesmen to "sell encyclopedias in the deceptive manner charged."[22] No direct evidence supports such a view. Indeed, Melley testified that the operative reason for the selection of the actual contract format was a perhaps lazy, but otherwise blameless, decision to copy the clauses used by the competition.[23]

The Commission's findings rest on the inference that a deceptive use was intended to be made of concededly nonde-

---

14. 338 F.2d 149 (1st Cir. 1964). "In the absence of evidence of personal involvement in Coro's [the company's] unlawful conduct," a showing of "overall corporate responsibility" was held *not* enough to support direction of the cease and desist order against an individual who was the largest corporate shareholder, President, and Chairman of the Board.

15. App. at p. 362.

16. App. at p. 351.

17. App. at p. 198.

18. App. at p. 351.

19. 198 F.2d 404 (2nd Cir. 1952). In this case, deceptive order forms furnished by the company supported an inference that the corporate officers "actively encouraged and participated in making the said false representations." 198 F.2d 404, 407.

20. 187 F.2d 693 (7th Cir. 1951). Since the literature provided by the company, in this case, was held to be deceptive in its own right, the corporate officers could not escape responsibility just because even more misleading statements were made by salesmen.

21. App. at p. 198.

22. App. at p. 199 (emphasis added).

23. App. at p. 365.

ceptive language. If it were the case that the language of the contract had no other reasonable and commercially proper use, such a gossamer inference just might withstand scrutiny. However, all of the contract clauses singled out by the Commission do have legitimate and nondeceptive functions.

The FTC suggests that the spaces provided for filling in military service information were designed to facilitate salesmen's claims that, as a member of the military, the customer was getting a special price. Yet, at another place in the very same opinion, the Commission mentions the more obvious, legitimate, and I submit the actual, purpose for collecting this data: the customer location "problem . . . created by . . . [the] business policy of directing sales to military personnel." [24] Since that group is extremely mobile, detailed and accurate military service information was essential to keep track of people who had installment obligations to fulfill.

The FTC notes that the contract mentions a charge of $3.95 "for delivery" of an extension service and binder. Their contention is that this language was intended to buttress the salesmen's fiendishly deceptive claim that the additional cost was merely for "postage and handling charges." Given the fact that $3.95 was indeed the total price, I find it difficult to share the Commission's grave concern about the misleading effect of this oral representation. Even if I did share that concern, I would still be persuaded that a contract drafted with intent to support the "postage and handling" characterization would use that precise language rather than the more ambiguous "for delivery" term.

The FTC further argues that this scheme of deception was writ large in the contract's reference to the "National Combination Offer." Whatever the salesmen may have said, falsely, about lower prices for larger purchases, the fact remains that this phrase refers to a perfectly legitimate method by which Standard Educators sold its books. By assigning point values, rather than dollar values, to additional books sold in $50 increments above the basic encyclopedia, the company offered flexibility and benefited from simplified accounting. Since the Commission has not characterized this as an illegal "tie in," how the mere reference to this legitimate marketing system shows the contract authors' purpose to deceive remains a mystery to me.

Finally, the FTC claims that the contract provision calling for the customer's agreement to give his opinion on the New Standard Encyclopedia demonstrates an intention to bolster the salesmen's suggestion of a special price offered in exchange for an endorsement. Apparently, the Commission completely overlooked the more obvious possible purpose for this contract clause: an actual desire to obtain testimonials for use in advertising the product. The technique of advertising by testimonials has not, so far, been ruled illegal. As with the previously cited inferences, the Commission has chosen the one explanation of the contract drafters' purpose, in preference to the many possible legitimate ones, which leads to a finding of intent to deceive; and it has made its choice for no other reason, from all that appears in the record, than that the desired result of holding Mr. Melley individually responsible could thereby be reached.

What the Commission has done in its analysis of the contract is subtly to shift the burden of proof. For example, with regard to the testimonials, the Commission apparently felt that, once there was a showing that the contract clause actually corresponded to salesmen's misrepresentations, Melley bore the burden of demonstrating a legitimate purpose for the language.[25] This approach no longer requires the complaint counsel to make a

24. App. at p. 217.

25. Presumably, Melley might have met this novel burden by showing that an ad campaign based on testimonials was in fact conducted. However, even if the contract clause had been inserted with a bona fide intent to collect endorsements, there are

substantial showing that the prohibited purpose existed. It clearly conflicts with accepted notions of where the burden falls in such a proceeding. In addition, it is most unfair, since the Commission drew its inferences about intent after the hearing at which Melley could have presented rebuttal evidence. Once Mr. Melley's counsel had established that the contract itself was not deceptive, he might well have reasonably concluded that his need to present further evidence on the language used had ended. Given the extremely tenuous nature of the FTC's further inferences from the contract's language to its drafters' purpose, I for one cannot blame Melley's counsel for failing to anticipate and rebut them.

This case comes down, in the end, to questions of Mr. Melley's state of mind —his purpose in drafting the contracts and his knowledge of the detailed practices of salesmen in the field. That question necessarily turns to a large degree on the credibility of Melley's testimony; and the hearing examiner, who had the best opportunity to assess Melley's credibility, believed him.

The Commission obviously wanted very badly to overturn the hearing examiner's ruling. It took an unlikely end run via inferences that contract language, innocent on its face and serving other legitimate purposes, was *intended* to be used for deception merely because it was *actually* so used by some salesmen. That sort of analysis would justify an inference that a company officer who authorized door-to-door sales must have intended to foster misrepresentation because that method of sale may provide the personal contact necessary for an unscrupulous and talented salesman to convince the customer that he is getting a special price because he lives

at that address, came to the door within one minute, or has a nice face. Everything that facilitates a sale *could* be labelled "an integral part" of the *salesman's* deceptive scheme; but, when a possible proper use appears, and absent additional evidence, the intent of the supplier that it be used deceptively should not be so lightly inferred.

Though this court normally gives deference to administrative agency decisions, if supported by testimony, I am not aware of any "expertise" in the Federal Trade Commission which permits it to find an individual responsible for deceptive conduct, and to issue a cease and desist order against that individual, when no evidence in the record makes the inference it draws any more likely than an inference clearing him of personal responsibility. That this court need not respect a greater aptitude in the FTC for drawing deductive logical conclusions is amply demonstrated by the outrageous manner in which the Commission has constructed its "chain" of "reasoning" in this case.

It seems to me that affirmance here either changes the law by holding corporate officers individually liable to cease and desist orders with regard to acts with which they had no connection, save their "mere ownership and control," *or* it gives the FTC a mandate to exercise no less than mystical powers. The Commission may, under the sort of reasoning approved here, act not on the basis of the record created by its complaint counsel but on sheer instinct. Heretofore such a modus operandi has been more common in the sensational press than in quasi-judicial proceedings.

Since Melley has not been shown *ever personally* to have participated in *any* deceptive practice, he is not even being

many possible reasons why an ad campaign might not in fact have resulted. In that event, the difficulties of showing a proper purpose merely highlight the need

for scrupulous care whenever guilty intent is presumed and the accused must prove the negative.

given the dubious benefits of the "bad man" theory. This record would not even support a high-handed attempt to enjoin, and therefore brand as a likely offender, one with a proven "predilection" to violate the law.

Rather, it appears that the FTC and the majority have carved a new niche in the law for "guilt by office" and "guilt by association." Mr. Melley is saddled with a "heavy burden of *exculpation*" even though no *inculpating* evidence (beyond mere ownership and control—which is *not* enough) has been introduced! The majority seems to find that "we know your type" is acceptable logic [26]—at least when applied to a corporation executive rather than a common criminal.

I recognize that there are in fact different standards of proof in criminal trials and civil cease-and-desist order proceedings. But the lower standard in this kind of case surely cannot be so low that it amounts to *no* standard of proof or indeed, as here, actually shifts the burden once complaint counsel has rested on a wink or a leer.

Nor can the absence of criminal penalties support an argument that Melley is not harmed by being individually named in the cease and desist order. The upright man need not fear the *direct* impact of an injunction commanding him to remain honest. But the very existence of the order tells the whole world, unless it too is enjoined, that he alone has been found likely to transgress. By its unfounded order, the FTC has filched Melley's reputation—a crime more serious than the one alleged, for it enriches the Commission not and makes Melley poor indeed.

I respectfully dissent.

---

26. This approach is highlighted by the elaborate but irrelevant exposition by the majority, in footnote 2, attempting to link this case to Standard Education Society. Mr. Melley's former legitimate business dealing with that firm, of course, have no probative value. The similarity of the conduct of salesmen in both cases may testify to the endurance of the confidence game—but it simply cannot show Mr. Melley's personal involvement in their violations. Recognizing this, the majority is reduced to listing these facts as merely "interesting to note"—exactly the sort of improper "raised eyebrow" technique in which the commission was engaged.