**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 21 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FEDERAL TRADE COMMISSION,

    Plaintiff-Appellant,

v.

FREECOM COMMUNICATIONS, INC.;
FINANCIAL FREEDOM REPORT;
SILENT SALESFORCE; ELEVA;
AMERICAN HOME BUSINESS
ASSOCIATION; FFR MARKETING;
ROBERT V. BRAZELL; DON S. GULL;
KELLY HAROLDSEN; ANNETTE S.
BRAZELL; DANA P. GULL,

    Defendants,

and

MARK O. HAROLDSEN,

    Defendant-Appellee.

No. 03-4063

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 96-CV-492-S)**

---

Lawrence DeMille-Wagman (William E. Kovacic, General Counsel, and John F. Daly,
Deputy General Counsel for Litigation, with him on the briefs), Federal Trade
Commission, Washington, D.C., for Plaintiff-Appellant.

Evan A. Schmutz (Wm. Kelly Nash with him on the brief), Hill, Johnson & Schmutz,
L.C., Provo, Utah, for Defendant-Appellee.

Before **TACHA**, Chief Circuit Judge, and **BALDOCK** and **HENRY**, Circuit Judges.

**BALDOCK**, Circuit Judge.

The Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(b), authorizes a district court to award attorney fees against the Government under the bad faith exception to the common law's "American Rule" that each party bear the financial burden of civil litigation regardless of its outcome. The Government acts in bad faith when its claim (1) is entirely without color *and* (2) has been asserted wantonly, for purposes of harassment or delay, or other improper reason. Federal Deposit Ins. Corp. v. Schuchmann, 319 F.3d 1247, 1250 (10th Cir. 2003). In this case, we must decide whether § 2412(b)'s bad faith exception justified a limited award of attorney fees against Plaintiff Federal Trade Commission (FTC) and in favor of Defendant Mark Haroldsen (Haroldsen). The district court thought so; we do not, and reverse.

I.

The FTC brought this action in 1996. In its first amended complaint, the FTC alleged defendants, a group of interrelated corporations and individuals including Haroldsen, had engaged in "unfair or deceptive acts or practices in or affecting commerce" in violation of § 5, 15 U.S.C. § 45(a), of the Federal Trade

2

Commission Act (FTC Act) (codified at 15 U.S.C. §§ 41-58).[1]  According to the

FTC, defendants from January 1993 onward made a variety of misrepresentations

likely to mislead consumers regarding projected income from numerous home-based

business ventures which defendants promoted and sold.  Defendants sold, among

other things, small vending machines which offered a handful of candy for a quarter.

Defendants' sales approached $100 million per year at their peak.  Counts I through

VIII of the FTC's complaint alleged defendants provided fraudulent income projections

to consumers in various infomercials, print ads, and seminars.  Counts IX and X alleged

defendants engaged in false or deceptive consumer telemarketing.  Counts XI through

XVI alleged defendants used atypical, false, and/or inapplicable success stories and

testimonials to reflect the ordinary experiences of satisfied consumers.  The FTC

---

[1] The six corporate defendants originated from one corporation, originally named Mark O. Haroldsen, Inc.  In 1990, Mark O. Haroldsen, Inc. changed its name to Financial Freedom Report, Inc. (FFR).  In 1994, FFR changed its name to Freecom Communications, Inc. (FCI).  In August 1995, defendant FCI spun off five corporations, defendant Financial Freedom Report, Inc., defendant Financial Freedom Report Marketing, Inc., defendant American Home Business Association, Inc., defendant Silent SalesForce, Inc. (SSF), and defendant Eleva, Inc.  Each corporation was responsible for a different aspect of defendants' marketing scheme.  Individual defendants Robert Brazell and Don Gull were officers, directors, and/or shareholders of each corporate defendant.  Defendant Kelly Haroldsen was an officer and director of SSF.  Defendants Annette Brazell and Dana Gull are the wives of Robert Brazell and Don Gull, respectively.  The wives allegedly received preferential transfers of property from their husbands during the relevant time period.  These transfers were the subject of counts XVII and XVIII of the complaint.  Throughout the remainder of this opinion, we refer to Haroldsen separately from the other "defendants."  Reference to "defendants" in this opinion includes the corporate defendants and all their defendant officers and directors except Haroldsen.

3

sought injunctive relief and consumer redress against defendants under § 13(b) of the FTC Act, 15 U.S.C. § 53(b).

The FTC's complaint further alleged Haroldsen, as the majority shareholder of all corporate defendants (by way of a family trust), "had the authority to control the acts and practices of each of the corporate defendants," including the content of sales materials and presentations. The FTC specifically averred:

> At all times relevant to this Complaint, [Haroldsen] has had or should have had knowledge of the content of the sales materials and sales presentations described . . . including specifically the language cited in Counts One through Sixteen, and has known or should have known that the representations described in Counts One through Sixteen were and are false and misleading. [Haroldsen] has failed to exercise his authority over the acts and practices described in Counts One through Sixteen. Defendant Mark O. Haroldsen is, therefore, liable for redress to all persons who purchased a home-based business starter kit or related product or service from any of the corporate defendants at any time from January 1, 1993, to the present.

Between May 1997 and October 2001, the FTC entered into consent judgments with ten defendants. An eleventh defendant filed bankruptcy. The judgments imposed injunctive relief upon each defendant. Defendants also were required to submit financial statements that established their inability to pay consumer redress. Furthermore, each judgment provided the court would impose a multi-million dollar judgment against any defendant that submitted a false financial statement.

With an October 22, 2001 bench trial looming, the FTC and Haroldsen–the only remaining defendant–engaged in settlement discussions. Counsel for the two parties

4

tentatively agreed on a settlement consisting of injunctive relief and $350,000 in consumer redress. The five-member FTC Board, however, rejected the settlement. Subsequently, the district court entered an order on October 3, 2001, directing "all parties and counsel with final decision-making authority to appear at the court and participate in a mandatory settlement conference . . . . Counsel and parties will be requested to report to the court throughout the day on any progress made." On October 11, the date of the conference, counsel appeared on behalf of the FTC. No member of the FTC board authorized to settle the case appeared. Rather, the FTC Board authorized counsel to settle only if Haroldsen would pay $2 million in consumer redress. Haroldsen rejected the FTC's offer and the case did not settle.

On October 17, five days prior to trial, Haroldsen moved to dismiss counts IX through XVI of the FTC's complaint. Haroldsen argued the counts failed to plead fraud with particularity under Fed. R. Civ. P. 9(b). In the alternative, Haroldsen filed a motion in limine seeking to severely restrict the FTC's trial evidence on all counts. The district court denied Haroldsen's motion to dismiss as beyond the deadline for dispositive motions, but granted his motion in limine. The court concluded counts IX through XVI "are not alleged with the specificity or particularity required by Fed. R. Civ. P. 9(b)." The court thus barred the FTC from introducing *any* evidence in support of those counts. The court concluded the FTC had pled counts I through VIII with particularity. Nevertheless, the court restricted the FTC's evidence *only*

5

"to those acts and practices alleged with particularity in the First Amended Complaint."

On the first day of trial, the FTC sought to introduce the testimony of four consumers who had purchased home-based businesses from the corporate defendants after listening to their "sales pitch." The court excluded three of the consumers' testimony, however, because none of the three could verify they actually heard the allegedly misleading statements specifically pled in counts I through VIII of the complaint. The fourth consumer testified he did not earn near the income which defendants represented he would earn. On the second day of trial, the FTC presented three witnesses. The first two witnesses testified regarding defendants' allegedly false statements that individuals purchasing home-based vending machine businesses could expect monthly income of $80 per machine. The third witness testified regarding Haroldsen's involvement in defendants' corporate affairs. The FTC again presented three witnesses on the third day of trial. Two witnesses testified regarding Haroldsen's involvement in corporate affairs. The third witness testified regarding the basis for the $80 income figure. On the final day of the FTC's case-in-chief, the FTC presented the testimony of two corporate officers. The officers testified Haroldsen was well aware of defendants' alleged misrepresentations. The FTC's final witness was defendants' human resources director. He testified Haroldsen was involved in many aspects of defendants' business operations.

At the close of the FTC's case, Haroldsen moved for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c). The district court granted Haroldsen's motion and subsequently entered written findings and conclusions. The court found the FTC failed to introduce any credible evidence that Haroldsen (1) engaged in deceptive acts or practices by misrepresenting the income potential of defendants' products and services, (2) had authority to control any alleged deceptive acts or practices of defendants, and (3) either knew or should have known of any material misrepresentations made by defendants.

Notably, the district court's order concluded with findings the FTC "refused to participate in good faith in settlement discussions prior to the trial . . . in disregard of the court's orders," and the FTC's "prosecution of this case has been conducted in bad faith, vexatiously, wantonly and for oppressive reasons." The court reiterated the latter finding in its conclusions of law. The district court's separate judgment specifically stated the FTC's "prosecution of this action has been undertaken in bad faith, vexatiously, wantonly and for oppressive reasons." The FTC moved the court to amend the judgment by deleting this language, and to delete the latter two findings from its findings and conclusions as beyond the scope of the evidence and contrary to procedural safeguards. The district court amended the judgment, but did not,

7

based on the record, disturb its findings.[2]

Haroldsen subsequently moved for attorney fees and expenses pursuant to 28 U.S.C. § 2412(b). The FTC's response addressed both the course of the litigation and the evidence it was prepared to introduce absent the court's order granting Haroldsen's motion in limine. Following a hearing, the court imposed attorney fees against the FTC, explaining:

> [C]ontinued pursuit of the [FTC's] claims against Defendant Haroldsen may have been deemed appropriate through the close of discovery [July 2, 2001]. However, after said closure, the [FTC's] evaluation of the evidence is found to be unreasonable, and any further pursuit of Mr. Haroldsen is found to be based upon his ability to pay rather than upon the merit of any appropriate claim, and is accordingly found to be an improper purpose and in bad faith.
>
> The court is persuaded further by [Mr. Haroldsen's] statement that after contact with hundreds of consumers, identified by the FTC as injured parties, none had been contacted by the FTC or claimed injury nor were

---

[2] The FTC explained why it did not appeal the court's final judgment:

Ten of the defendants had entered into consent judgments. Only Haroldsen was not under order, and he was no longer engaged in the conduct challenged by the Commission. Further, a successful appeal would only have resulted in a remand at which the court would have resumed the trial to give Haroldsen an opportunity to present evidence. This might have resulted in another judgment in Haroldsen's favor. Morever, by the time that an appeal was completed and the matter was returned to trial, much of the Commission's evidence would be at least eight years old.

The FTC was not required to appeal the underlying judgment and its failure to do so is not evidence of bad faith. See Schuchmann, 319 F.3d at 1253 (rejecting district court's view that failure to appeal the underlying judgment indicated bad faith because several reasons–which do not involve improper motive–exist for not appealing a case).

8

planning or subpoenaed to come to trial. Without consumer injury, the FTC had no claim and no basis upon which to proceed against Mr. Haroldsen, thus the court's conclusion of an improper motive . . . .

Thereafter, the court entered written findings and conclusions. A large portion of the court's findings addressed off-the-record settlement negotiations between the FTC and Haroldsen. According to the court, the FTC made "exorbitant and unsupported settlement demands" based on false claims it could prove damages against Haroldsen in the amount of $150 million through the testimony of hundreds of injured consumers prepared to testify as to defendants' deceptive acts and practices. The court further noted no one from the FTC with "final decision-making authority" appeared at the mandatory settlement conference in October 2001.

As to the FTC's substantive case against Haroldsen, the court found "the FTC utterly failed to introduce sufficient probative evidence in support of its allegations." The court reiterated many of its findings previously entered on Haroldsen's Rule 52(c) motion, including its finding the FTC failed "to introduce any evidence of consumer injury." The court concluded:

> After July 2, 2001, at the latest, the evidence, or lack of it, demonstrates that this action was maintained maliciously and without probable cause because the FTC's allegations could not be reasonably supported by the evidence. Instead, the FTC acted with knowledge of the absence of evidence, particularly after the FTC had closed discovery, and apparently maintained the action for the purpose of annoying, embarrassing and threatening Mr. Haroldsen evidently as a means of gaining leverage to demand settlement monies.

9

The court awarded Haroldsen $190,250.10 in fees, expenses, and costs, from which the FTC appeals. The FTC agrees to costs totaling $13,626.39. Thus, the FTC actually objects to $176,623.71 of the award. We have jurisdiction under 28 U.S.C. § 1291.

## II.

A prevailing party has the initial burden of establishing entitlement to attorney fees under 28 U.S.C. § 2412(b).[3] Espinoza-Gutierrez v. Smith, 94 F.3d 1270, 1279 (9th Cir. 1996). Section 2412(b) provides in relevant part:

> Unless expressly prohibited by statute, a court may award reasonable fees . . . of attorneys, . . . to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. *The United States shall be liable for such fees . . . to the same extent that any other party would be liable under the common law.*

(emphasis added). We employ a two-prong test to determine when the bad faith exception to the American Rule as codified in § 2412(b) justifies a fee award: "A party acts in bad faith only when the claim brought 'is entirely without color *and* has been asserted wantonly, for purposes of harassment or delay, or for other

---

[3] When the prevailing party's net worth does not exceed $2 million, § 2412(d)(1)(A) permits a fee award against the Government in non-tort suits unless the Government establishes its position was "substantially justified." Because Haroldsen's net worth exceeds the $2 million limit set forth in § 2412(d)(2)(B)(i), he cannot qualify for a fee award under subsection (d)(1)(A), and instead must utilize § 2412(b). See Maritime Mgmt., Inc. v. United States, 242 F.3d 1326, 1331-32 & n.8 (11th Cir. 2001) (contrasting § 2412(b) with § 2412(d)); Kerin v. United States Postal Serv., 218 F.3d 185, 189-91 (2d Cir. 2000) (same); Wells v. Bowen, 855 F.2d 37, 46 (2d Cir. 1988) (noting a fee award under § 2412(b) "requires far more egregious conduct on the government's part than required by § 2412(d)").

10

improper reasons.'" Sterling Energy, Ltd. v. Friendly Nat'l Bank, 744 F.2d 1433, 1435 (10th Cir. 1984) (quoting Browning Debenture Holders' Comm. v. Dasa Corp., 560 F.2d 1078, 1088 (2d Cir. 1977)) (emphasis added); accord First Bank of Marietta v. Hartford Underwriters Ins. Co., 307 F.3d 501, 524 (6th Cir. 2002); see also McCandless v. Great Atl. & Pac. Tea Co., 697 F.2d 198, 200 (7th Cir. 1983).[4] The test is conjunctive; that is, both a complete lack of color and improper purpose must be present to support a fee award under § 2412(b). San Juan Prod. Inc. v. San Juan Pools of Kan., Inc., 849 F.2d 468, 476 (10th Cir. 1988).

We will not disturb a district court's award of attorney fees under § 2412(b) absent an abuse of discretion. Schuchmann, 319 F.3d at 1250. Even so, subsection (b) "is an extremely narrow exception under which a trial court may award attorney[] fees." United States v. 2,116 Boxes of Boned Beef, 726 F.2d 1481, 1488 (10th Cir. 1984). Because a fee award under § 2412(b) is punitive, courts may impose such a penalty "only in exceptional cases and for dominating reasons of justice." Id. (internal quotations omitted). "Clear evidence" must support such an award: "[A]ttorney[] fees are awarded only when there is 'clear evidence' that challenged actions are

---

    [4] Circuit court decisions are not uniform in their approach to the standard governing an award of attorney fees under § 2412(b). See, e.g., Maritime Mgt., 242 F.3d at 1333 ("In determining the propriety of a bad faith fee award, the inquiry will focus on the conduct and motive of a party, rather than on the validity of the case.") (internal quotations omitted); see also Stive v. United States, 366 F.3d 520, 522 (7th Cir. 2004) (noting in a different context the lack of a "precise standard" governing an award of attorney fees under § 2412(b)).

taken entirely without color and are pursued for [improper] reasons[.]" Autorama

Corp. v. Stewart, 802 F.2d 1284, 1288 (10th Cir. 1986) (citing Weinberger v.

Kendrick, 698 F.2d 61, 80 (2d Cir. 1982)); accord Schuchmann, 319 F.3d at 1250.

In addressing the initial question of whether an action was "entirely without

color," we resist the urge to undertake a full merits review of the case. The question

is whether, viewed in light of the record evidence and underlying substantive law,

the losing party's claims lacked *any* legal or factual basis:

> A claim is entirely without color when it lacks *any* legal or factual basis.
> Conversely, a claim is colorable when it has some legal and factual support,
> considered in light of the reasonable beliefs of the [party] making the claim.
> The question is whether a . . . reasonable plaintiff . . . could have concluded
> that facts supporting the claim *might be established*, not whether such facts
> actually *had been established*. Thus, . . . we note that a claim that fails
> as a matter of law is not necessarily lacking *any* basis at all. A claim
> is colorable when it reasonably *might* be successful, while a claim lacks
> a colorable basis when it is utterly devoid of a legal or factual basis.

Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 337 (2d Cir. 1999) (internal

quotations and citations omitted). Consequently, a "weak or legally inadequate" claim

will not support a fee award under § 2412(b). Schuchmann, 319 F.3d at 1252.

### III.

In this case, the FTC charged Haroldsen with sixteen counts of violating

§ 5 of the FTC Act through defendants' use of infomercials, print ads, seminars,

telemarketing, and testimonials. Among other things, § 5 declares unlawful "deceptive

acts or practices in or affecting commerce." See California State Bd. of Optometry v.

12

Federal Trade Comm'n, 910 F.2d 976, 978 (D.C. Cir. 1990) (tracing § 5's history).

The primary purpose of §5 is to lessen the harsh effects of *caveat emptor*. Such rule "can no longer be relied upon as a means of rewarding fraud and deception and has been replaced by a rule which gives to the consumer the right to rely upon representations of facts as the truth." Federal Trade Comm'n v. Sterling Drug, Inc., 317 F.2d 669, 674 (2d Cir. 1963) (internal citation omitted); see also Federal Trade Comm'n v. Standard Educ. Soc'y, 302 U.S. 112, 116 (1937) (consumer protection laws "are made to protect the trusting as well as the suspicious"). Because the primary purpose of § 5 is to protect the consumer public rather than to punish the wrongdoer, the intent to deceive the consumer is not an element of a § 5 violation. See Federal Trade Comm'n v. Amy Travel Serv., Inc., 875 F.2d 564, 573 (7th Cir. 1989); United States v. Johnson, 541 F.2d 710, 712 (8th Cir. 1976). Instead, the "cardinal factor" in determining whether an act or practice is deceptive under § 5 is the likely effect the promoter's handiwork will have on the mind of the ordinary consumer. Sterling Drug, 317 F.2d at 674.[5]

---

[5] Recent § 5 cases tend to speak in terms of the "reasonable" rather than the "ordinary" consumer. See, e.g., Federal Trade Comm'n v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003); Federal Trade Comm'n v. Publishing Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997). We believe reference to the "reasonable consumer" in the context of § 5 may be misleading. Consumer protection laws exist to protect "the public–that vast multitude, which includes the ignorant, the unthinking, and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions." 3A Louis Altman, Callman on Unfair Competition, Trademarks and Monopolies § 21:9, at 21-80 (4th ed. 2004) (internal quotations and footnotes omitted). "Unlike the abiding faith which the law has in the

(continued...)

13

In the court's pretrial order signed and entered on the first day of trial, the FTC specifically sought both injunctive relief and ancillary relief in the form of consumer redress against Haroldsen under § 13(b) of the FTC Act.[6]  To obtain injunctive relief against an individual for a business entity's acts or practices, the FTC first must prove the entity violated § 5.  See Federal Trade Comm'n v. Think Achievement Corp., 144 F. Supp. 2d 993, 1009-11 (N.D. Ind. 2000), aff'd, 312 F.3d 259 (7th Cir. 2002).  The FTC must further show the individual participated directly in the business entity's deceptive acts or practices, or had the authority to control them.  See Federal Trade Comm'n v. Publishing Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997).  To obtain consumer redress against an individual subject to injunctive relief under § 13(b),

[5](...continued)
'reasonable man,' it has very little faith indeed in the intellectual acuity of the 'ordinary purchaser' who is the object of the advertising campaign."  Sterling Drug, 317 F.2d at 674.  "The average purchaser has been variously characterized as not 'straight thinking,' subject to 'impressions,' uneducated, and grossly misinformed; . . . he wishfully believes in miracles . . . ."  Id. (internal quotations omitted).  At the same time, however, courts should remain mindful that "the purchasing public must be credited with at least a 'modicum of intelligence,' a 'minimum capacity for discrimination.'  Ordinary carelessness does not encompass extraordinary blindness."  3A Altman, Callman on Unfair Competition § 21:9, at 21-90 to 21-91 (internal footnotes omitted).

[6]  Section 13(b), 15 U.S.C. § 53(b), provides the remedy for a § 5 violation.  Although § 13(b) does not expressly authorize a court to grant consumer redress (i.e., refund, restitution, rescission, or other equitable monetary relief), § 13(b)'s grant of authority to provide injunctive relief carries with it the full range of equitable remedies, including the power to grant consumer redress.  In cases where the FTC seeks injunctive relief, courts deem any monetary relief sought as incidental to injunctive relief.  See Federal Trade Comm'n v. Gem Merch. Corp., 87 F.3d 466, 468-69 (11th Cir. 1996); Federal Trade Comm'n v. Pantron I Corp., 33 F.3d 1088, 1102 (9th Cir. 1994).

14

the FTC must proffer evidence tending to show consumers actually relied on the entity's deceptive acts or practices to their detriment. See Federal Trade Comm'n v. Figgie Int'l, Inc., 994 F.2d 595, 605-06 (9th Cir. 1993). The FTC also must establish the individual knew or should have known of the entity's misrepresentations. See Amy Travel Serv., 875 F.2d at 574. We discuss these elements of the FTC's case against Haroldsen in turn and apply each to the FTC's evidence in this case.

A.

To hold an individual personally liable for a business entity's misrepresentations, the FTC first must prove an underlying § 5 violation. See Think Achievement Corp., 144 F. Supp. 2d at 1009-11. Section 5, consistent with its purpose, requires the FTC to show the business entity made material representations *likely to mislead* ordinary consumers to their detriment. See Federal Trade Comm'n v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003); Federal Trade Comm'n v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988); Southwest Sunsites, Inc. v. Federal Trade Comm'n, 785 F.2d 1431, 1436 (9th Cir. 1986). Misrepresentations concerning anticipated income from a business opportunity generally are material and likely to mislead consumers because such misrepresentations strike at the heart of a consumer's purchasing decision. See Federal Trade Comm'n v. Kitco of Nevada, Inc., 612 F. Supp. 1282, 1292 (D. Minn. 1985) (citing Goodman v. Federal Trade Comm'n, 244 F.2d 584, 599 (9th Cir. 1957)). Neither proof of consumer reliance nor consumer injury is necessary to establish a

15

§ 5 violation. See Think Achievement, 144 F. Supp. 2d at 1010. Otherwise, the law would preclude the FTC from taking preemptive action against those responsible for deceptive acts or practices, contrary to § 5's prophylactic purpose.

In this case, the record reveals defendants consistently represented the average monthly income from one small vending machine would approximate $80. The evidence, however, showed defendants' $80 figure was inflated. At trial, a consumer witness testified his machines earned considerably less than the amount defendants represented.[7]

---

[7] The FTC summarized much of the testimony the district court excluded from trial in its response to Haroldsen's motion for attorney fees. The proffered evidence included the testimony of shills apparently paid to fabricate success stories regarding defendants' vending machines. Although inconsistent with the purpose of the FTC Act and highly impractical, the district court demanded strict compliance with Fed. R. Civ. P. 9(b) and required the FTC to allege each individualized act (i.e., time, place, and manner) of deception it intended to raise at trial. Cf. 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1298, at 233-34 (2004) (sufficiency of a fraud pleading varies with the complexity and duration of the scheme). To that end, four days prior to trial, the court granted Haroldsen's motion in limine and limited the FTC's evidence on counts I through VIII "to those acts and practices alleged with particularity." The court's ruling resulted in the exclusion of three of the FTC's four consumer witnesses on the first day of trial. To make matters worse, the district court barred the FTC from introducing any evidence on counts IX through XVI relating to the allegedly false testimonials of shills, effectively dismissing those counts at the last moment, because the court believed those counts failed to allege fraud with the particularity Rule 9(b) required. See Lewis v. Buena Vista Mut. Ins. Assoc., 183 N.W.2d 198, 201 (Iowa 1971) (a motion in limine should be used "as a rifle and not as a shotgun"). A § 5 claim simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b), and the district's court's inclination to treat it as such unduly hindered the FTC's ability to present its case. Unlike the elements of common law fraud, the FTC need not prove scienter, reliance, or injury to establish a § 5 violation. See Federal Trade Comm'n v. Skybiz.com, Inc., 2001 WL 1673649, *4 (N.D. Okla. 2001) (unpublished) (refusing to apply Rule 9(b) to a § 5 claim); Federal Trade Comm'n v. Communidyne, Inc., 1993 WL

(continued...)

16

While the evidence did show some machines earned $80 or better per month, depending on their location, such earnings were not the norm. Gary Buehner, an operator of a vending machine business independent of defendants, testified Haroldsen personally contacted him in 2001 to substantiate the $80 income figure. Buehner testified his average monthly income per machine was $18. Joe Larkin, a market surveyor for defendants, testified the average income from defendants' vending machines was "in the low thirties." Other witnesses, whose testimony we will not detail here, also testified the $80 figure was inflated. Certainly, the FTC's claim that defendants violated § 5 by making material misrepresentations in the form of exaggerated income projections likely to deceive ordinary consumers is not without record support and thus not without color. Compare Federal Trade Comm'n v. Wolf, 1996 WL 812940, *5 (S.D. Fla. 1996) (unpublished) (holding defendants violated § 5 by misrepresenting expected earnings from a vending machine business).

## B.

The district court's finding that Haroldsen never personally misrepresented the income to be derived from defendants' products and services is beside the point

---

[7](...continued)
558754, *2 (N.D. Ill. 1993) (unpublished) (same). The FTC's action against Haroldsen was not a private or common law fraud action designed to remedy a singular harm, but a government action brought to deter deceptive acts and practices aimed at the public and to obtain redress on behalf of a large class of third-party consumers who purchased defendants' products and services over an extended period of time. See Federal Trade Comm'n v. Security Rare Coin & Bullion Corp., 931 F.2d 1312, 1316 (8th Cir. 1991).

because the law did not require the FTC to make such a such showing. To justify the imposition of injunctive relief against the individual, the FTC is required to show the individual participated directly in the business entity's deceptive acts or practices, *or had the authority to control* such acts or practices. See Publishing Clearing House, 104 F.3d at 1170. A showing of participation or control justifies injunctive relief against an individual if in the public interest, notwithstanding the fact business operations and/or deceptive acts and practices may have ceased. "It is settled that an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence[.]" Allee v. Medrano, 416 U.S. 802, 810 (1974). Otherwise "the defendant is free to return to his old ways." United States v. W. T. Grant, 345 U.S. 629, 632 (1953); see also Beneficial Corp. v. Federal Trade Comm'n, 542 F.2d 611, 617 (3d Cir. 1976) (explaining a court may order a prior deceptive practice to cease and desist if the practice could be resumed); Fedders Corp. v. Federal Trade Comm'n, 529 F.2d 1398, 1403 (2d Cir. 1976) (explaining injunctive relief may extend to a discontinued deceptive practice where the public interest requires).

Once the FTC presented evidence defendants violated § 5, it only had to show Haroldsen had the authority to control defendants to establish its case for injunctive relief against him. See Publishing Clearing House, 104 F.3d at 1170; Think Achievement, 144 F. Supp. 2d at 1010. Sam Burggraaf, defendants' human resources director, testified

18

that during the relevant time period, Haroldsen attended marketing committee meetings "frequently" and everybody "danced to his tune." In particular, Burggraaf testified: "[E]verybody knew that [Haroldsen] was the principal shareholder of the company and his opinions and advice and direction were listened to very carefully and were generally followed or heeded." Haroldsen's response in one particular instance where Burggraaf established a company wide United Way campaign without his knowledge is illustrative of Haroldsen's authority to control defendants:

A.      After we had instituted it, [Haroldsen] came into my office and was upset that we had instituted it without talking to him. He indicated that he did not have a favorable view of the United Way and that he did not want that program in *his company*.

Q.      And what happened?

A.      We discontinued the program.

(emphasis added). Burggraaf further testified Haroldsen was extensively involved in the hiring of senior management and seminar directors.

Despite Haroldsen's efforts to separate himself from defendants, Haroldsen was the controlling shareholder of the closely-held corporate defendants; in other words, he owned the corporate defendants. Consequently, a substantial inference exists that Haroldsen had the authority to control the deceptive acts and practices carried on in the name of *his* corporations. See Standard Educators, Inc. v. Federal Trade Comm'n, 475 F.2d 401, 403 (D.C. Cir. 1973). The district court's finding "the FTC failed to introduce *any evidence* that Mr. Haroldsen had the authority to control the acts

19

and practices of the defendant corporations with respect to any alleged deceptive act or practice" is not supported by the record. (emphasis added). The FTC's evidence supports an inference that Haroldsen had the authority to control defendants' deceptive acts and practices. Evidence of Haroldsen's authority to control defendants coupled with evidence suggesting defendants violated § 5 compels us to conclude the FTC presented both a legal and factual basis for injunctive relief against Haroldsen in the district court.

C.

To establish a right to consumer redress against an individual with the authority to control a business entity, the FTC faces a somewhat higher evidentiary burden. While proof of consumer reliance is unnecessary to establish a § 5 violation and the accompanying right to injunctive relief against the individual under § 13(b), such proof is necessary to establish the right to consumer redress. See Figgie Int'l, 994 F.2d at 605. The FTC is not required, however, to show any particular purchaser actually relied on or was injured by the unlawful misrepresentations:

> Proof of reliance by the consumer upon defendants' misrepresentations is a traditional element of recovery under common law fraud actions. Section 13 of the FTC Act differs from a private suit for fraud, however. Section 13 serves a public purpose by authorizing the Commission to seek redress on behalf of injured consumers. Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of the section.

Id. (quoting Kitco, 612 F. Supp. at 1293); accord Federal Trade Comm'n v. Security Rare Coin & Bullion Corp., 931 F.2d 1312, 1315-16 (8th Cir. 1991). To raise a

20

presumption of reliance, the FTC need only show (1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products. Federal Trade Comm'n v. Kuykendall, 371 F.3d 745, 765 (10th Cir. 2004) (en banc); see also McGregor v. Chierico, 206 F.3d 1378, 1388 (11th Cir. 2000); Figgie Int'l, 994 F.2d at 605-06; Security Rare Coin, 931 F.2d at 1316.

In this case, the FTC proffered evidence suggesting it could establish a presumption of consumer reliance. Based on evidence of defendants' income-related misrepresentations, as discussed above, and enormous sales figures, we may safely assume defendants widely disseminated those misrepresentations and consumers purchased defendants' products. Haroldsen acknowledged "more than 200,000 consumers tested or used [defendants'] business opportunity." By 1994, defendants' sales approached $100 million. During the same period, attendance at defendants' seminars approached 13,000 consumers per week. Such evidence, viewed in light of the applicable law, certainly suggests consumers relied on defendants' misrepresentations.[8] See Kuykendall, 371 F.3d at 765.

---

[8] The existence of a money-back guarantee is inadequate as a matter of law to preclude consumer redress in a § 5 action. See Pantron I, 33 F.3d at 1088. Likewise, the existence of some satisfied customers does not constitute a defense to a § 5 action. See Amy Travel Serv., 875 F.2d at 572.

As to the extent of injury resulting from consumer reliance, the court's pretrial order stated the FTC was prepared to prove consumer injury in the amount of $147 million–a figure consistent with the FTC's earlier off-the-record injury claim. The FTC derived this figure from defendants' tax documents which showed that from 1994 through 1996, defendants' net sales totaled over $147 million. Haroldsen acknowledges that "[b]etween 1992 and 1994 sales grew from $4 million to $100 million." Despite this evidence, the district court concluded no evidence of consumer injury existed and "without consumer injury, the FTC had no claim and no basis upon which to proceed against Mr. Haroldsen." The district court erroneously believed the FTC had to present a "parade" of consumer witnesses to establish its case against Haroldsen.

In Kuykendall, 371 F.3d at 764, we recently acknowledged gross receipts from consumer sales was a proper beginning point for the calculation of sanctions in a § 5 case. Kuykendall involved the violation of an order permanently enjoining individual and corporate defendants from telemarketing magazine subscriptions in violation of § 5. We rejected the argument that § 5 required the FTC to prove individual consumer reliance in a case involving a pattern or practice of misleading consumers over an extended period of time. Id. at 765; see also Security Rare Coin, 931 F.2d at 1315-16. Instead, we stated: "[A]llowing a damages determination based on gross receipts in a case arising directly under the FTC Act furthers the FTC's ability to carry out its statutory purpose." Kuykendall, 371 F.3d at 766 (internal footnote omitted); see also McGregor, 206 F.3d

22

at 1388-89 (affirming § 5 sanctions based on seller's gross sales). "To the extent the large number of consumers affected by the defendants' deceptive trade practices creates a risk of uncertainty [in the calculation of damages], the defendants must bear that risk." Id. at 765. The seller bears this risk because "[t]he fraud in the selling, not the value of the thing sold," is what entitles consumers to redress. Figgie Int'l, 994 F.2d at 606. Accordingly, the FTC's view that consumer injury in this case could amount to nearly $150 million was justified notwithstanding limited consumer testimony of particularized injury.

D.

Finally, to hold an individual personally liable for consumer redress, the FTC must show a heightened standard of awareness beyond the authority to control. This awareness, however, need not rise to the level of an intent to defraud. See Amy Travel Serv., 875 F.2d at 574. In particular, the FTC need only show the individual had or should have had knowledge or awareness of defendants' misrepresentations. Id. The FTC may fulfill its burden by showing the individual had "'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" Id. (quoting Kitco, 612 F. Supp. at 1292)

Once again, the FTC produced evidence suggesting Haroldsen knew or should have known of defendants' material misrepresentations. Guy Scribner, a corporate

23

employee and "pretty good friend[]" of Haroldsen testified he heard defendants' sales personnel make exaggerated income projections and reported this to Haroldsen on occasion. According to Scribner, Haroldsen "liked to hear what was going on right where the rubber met the road and I talked to him about that." Don Gull, a high-ranking corporate officer, testified Haroldsen attended and participated in a meeting where the topic of discussion was "speakers . . . taking license about things that they were representing about the products." Robert Brazell, another high-ranking corporate official, testified that at the same meeting "all of management addressed the speakers and became very specific at that point about certain representations that were being made." Brazell discussed his belief with Haroldsen that "speakers were not consistent with the actual product being delivered." At one point, Haroldsen held a meeting at his house to discuss issues of integrity and honesty. According to Brazell, the subjects of honesty and integrity were an "ongoing issue" within the business. We are satisfied record evidence suggests Haroldsen knew or should have known of defendants' material misrepresentations.

## IV.

To answer the question whether the FTC's case against Haroldsen was "entirely without color," we are bound to consider the course of the litigation subsequent to the formal close of discovery on July 2, 2001. After that date, according to the district court, the FTC's pursuit of its claims against Haroldsen became unreasonable because the FTC

24

"acted with knowledge" that its "allegations could not be reasonably supported by the evidence." As the foregoing discussion illustrates, however, as of July 2, 2001 and beyond, the FTC reasonably could have concluded facts "*might be established*" under § 5 of the FTC Act justifying both injunctive relief and consumer redress against Haroldsen. See Schlaifer Nance, 194 F.3d at 337. Accordingly, we disagree with the district court's conclusion that "[t]he allegations set forth in the First Amended Complaint were . . . frivolous and groundless." This simply is not the "exceptional case[]" where "dominating reasons of justice" warrant the imposition of attorney fees upon the Government under 28 U.S.C. § 2412(b). See Sterling Energy, 744 F.2d at 1436. Because "clear evidence" does not support the district court's conclusion that the FTC's action was "entirely without color," see Autorama, 802 F.2d at 1288, we hold the district court abused its discretion in awarding attorney fees to Haroldsen pursuant to 28 U.S.C. § 2412(b).[9]

---

[9] Because a case must be entirely without color *and* pursued for an improper purpose to justify a fee award under § 2412(b), we need not address the question whether the FTC pursued this action for an improper purpose. See San Juan Prod., 849 F.3d at 476. Nevertheless, we acknowledge the district court's apparent frustration with the FTC's refusal to settle this case with Haroldsen for $350,000. As we explained, however, the FTC's repeated statements it could prove $150 million in damages had some basis in both law and fact. Compare Schuchmann, 319 F.3d at 1253 (noting the district court's failure to explain why the Government's rejection of a $240,000 settlement and insistence upon a $2.5 million settlement constituted bad faith). According to the district court, the FTC falsely represented to Haroldsen that it "had hundreds of consumers ready to testify, *if necessary*, both as to corporate defendants' deceptive practices and to their consumer injuries." (emphasis added). We do not condone falsehoods on the part of

(continued...)

25

REVERSED.

---

[9](...continued)
the Government.  Accepting the court's finding as true, however, does not change the fact that the law did not require the FTC to present extensive testimony from injured consumers to establish its case against Haroldsen.  We emphasize that district courts cannot hope to referee the all-too-common outlandish puffing which unfortunately has become part of the adversary process.  District judges assigned to hear a nonjury case should be especially hesitant to involve themselves in settlement negotiations. See generally Laura M. Warshawsky, Objectivity and Accountability: Limits on Judicial Involvement in Settlement 1987 U. Chi. Legal F. 369; see also Wayne D. Brazil, Settling Civil Suits: Litigators' Views About Appropriate Roles and Effective Techniques for Federal Judges 84-99 (1985) (noting substantial attorney discomfort with assigned district judge's involvement in settlement negotiations, particularly in nonjury matters). What district judges can do, as the court sought to do in this case, is require the parties to engage in good faith settlement negotiations:  "[T]he court may require that a party or its representative be present or reasonably available by telephone in order to consider possible settlement of the dispute."  Fed. R. Civ. P. 16(c).  If a party refuses, the court, after proper notice and hearing, may impose sanctions under Rule 16(f).  See Schwartzman, Inc. v. ACF Indus., Inc., 167 F.R.D. 694 (D.N.M. 1996) (addressing as unacceptable the recurring problem of gaining access to a qualified government representative for the purpose of conducting a good faith settlement conference).