**UNITED STATES of America,**
**Plaintiff,**

v.

**CORPORATIONS FOR CHARACTER,**
**L.C., et al., Defendants.**

**Case No. 2:11–cv–419–RJS.**

United States District Court,
D. Utah,
Central Division.

Signed March 31, 2015.

Matthew G. Cooper, Sandy, UT, Allison F. Sheedy, Constantine Cannon LLP, Daniel Ferrel McInnis, Thompson Hine LLP, Washington, DC, Russell D. Harris, Murray, UT, for Plaintiff.

Arturo Anton DeCastro, Stephen T. Descano, Jr., Drake Cutini, U.S. Dept. of Justice, Consumer Protection, Washington, DC, Jared C. Bennett, U.S. Attorney's Office, Salt Lake City, UT, for Defendants.

## MEMORANDUM DECISION AND ORDER

ROBERT J. SHELBY, District Judge.

This is an enforcement action against a group of telemarketers. The Federal Trade Commission alleges that Defendants Corporations for Character, L.C., Feature Films for Families, Inc., Family Films of Utah, Inc., and Forrest Sandusky Baker III engaged in deceptive business practices during multiple telemarketing campaigns. In all, there are two evidentiary motions and five motions for summary judgment before the court. Below, the court provides a brief factual background and then takes up the pending motions.

## BACKGROUND

The FTC brings an enforcement action against a group of interrelated defendants.

Defendant Corporations for Character (C4C) is a Utah corporation that provides fundraising services to charitable and non-profit organizations through telemarketing campaigns. Defendant Feature Films for Families is a Utah corporation that markets family-friendly films through telemarketing. Defendant Family Films of Utah is a Utah corporation that supervises and directs the sales and telemarketing activities of C4C and Feature Films. Defendant Forrest Baker III is the president and chief executive officer of Feature Films, Family Films, and C4C. Defendants have jointly defended the lawsuit.

Defendants use prerecorded audio snippets to conduct telemarketing. An employee initiates a call then plays certain snippets depending on the consumers' response. The FTC alleges that the snippets Defendants used in past campaigns contained misleading statements.

In May 2011, the FTC sued Defendants in Florida federal court, alleging that Defendants had engaged in misleading business practices. The FTC sought equitable and injunctive relief, along with civil penalties. A day after the FTC filed its Complaint in Florida, Defendant C4C sued the FTC in this court. C4C sought declaratory relief and argued that the FTC had violated C4C's First Amendment and due process rights, violated the Administrative Procedures Act, and brought the enforcement action in bad faith. In March 2012, the Honorable Judge Clark Waddoups dismissed C4C's claims. A few months later, the Florida enforcement action was transferred to this court. The two actions were then consolidated.

## I. Telemarketing Campaigns to Solicit Contributions for Police and Firefighter Organizations

C4C provides telemarketing services to solicit contributions on behalf of several chapters of the Fraternal Order of Police (FOP) and the Firefighters Charitable Foundation. In exchange for its services, C4C takes a portion of the contributions. In past campaigns, C4C retained up to 70% of the proceeds from the FOP campaigns and 80% from the Firefighter Charitable Foundation campaign.

The FTC alleges that C4C made the following misrepresentations during the FOP and firefighter telemarketing campaigns:

- the FOPs would use the contributions to purchase bulletproof vests for police officers even though the FOPs neither intended to nor actually purchased bulletproof vests;
- any contributions made would go to the FOP or Firefighters Charitable Foundation without mention of the large sums going to C4C;
- the FOPs would use the contributions for law-enforcement training even though the FOPs did not do so;
- there were minimal administrative costs even though most of the contributions went to C4C; and
- the Firefighters Charitable Foundation would retain 20% of every dollar when in reality it retained 15%.

Defendants contend that C4C did not make misleading statements during the Firefighters Charitable Foundation and FOP campaigns.

## II. The Kids First and *Velveteen Rabbit* Campaigns

### A. Kids First Campaign

Feature Films and C4C have also conducted telemarketing campaigns to promote family-friendly films. In 2008 and 2009, C4C called consumers across the country as part of the Kids First campaign. C4C conducted the campaign on behalf of the Coalition for Quality in Chil-

dren's Media, which owns the Kids First trademark. Defendants and the Coalition for Quality agreed that C4C would make survey and solicitation calls and would retain up to 93% of the donations, in addition to shipping and handling costs. C4C also had the right to use information obtained during the campaign for its own purposes, including marketing and solicitation.

During the Kids First campaign, C4C telemarketers would ask call recipients to serve as volunteers. Becoming a volunteer entailed agreeing to receive two free family-friendly DVDs, watching the DVDs, and providing feedback about the movies during a second phone call. During the second phone call, C4C asked the volunteers to support the Kids First project by purchasing two additional DVDs. The FTC alleges that C4C made misrepresentations during these calls. In particular, the FTC alleges that C4C telemarketers represented that all proceeds would be used in the Kids First project when in reality up to 93% went to Defendants.

### B. The *Velveteen Rabbit* Campaign

Mr. Baker produced a film named *The Velveteen Rabbit*. Prior to the film's release in theaters, Feature Films made approximately eight million unsolicited phone calls on Mr. Baker's behalf to promote the film. During those calls, Feature Films guaranteed some consumers that they would receive a free DVD of their choosing if they did not enjoy the film. Feature Films also told some consumers that if they purchased a ticket, they would receive a credit to buy other Feature Films DVDs.

### III. The Do–Not–Call Registry

The FTC alleges that Defendants called millions of phone numbers that were on the National Do–Not–Call Registry. In particular, the FTC alleges that C4C made

1. Dkt. Nos. 38, 39, 41, and 75.

two and a half million calls to registered numbers during the *Velveteen Rabbit* campaign, five million during the Kids First campaign, and nine million during a continuous telemarketing campaign to sell Feature Films DVDs. The FTC also alleges that Defendants made calls to people who told C4C or Feature Films representatives that they did not wish to receive further calls.

### IV. Defendants' Caller ID Practices

Finally, the FTC alleges that Defendants have failed to submit sufficient identifying information to caller-identification services. When Feature Films conducted the *Velveteen Rabbit* campaign, Defendants submitted the phrases "VELVETEEN" and "VELVETEENMOV" to be displayed on caller IDs. For calls to sell Feature Films DVDs, Defendants submitted the phrases "CUSTOMER SVC FE" and "FAMILY VALUE CB."

### ANALYSIS

DISCUSSION ON EVIDENTIARY MOTIONS

### I. Defendants' Motion to Strike Exhibits

Defendants filed a Motion to Strike three of the FTC's exhibits submitted with its summary judgment briefing:[1] the declaration of Kelly Horne (Exhibit 8), the compendium of script excerpts (Exhibit 9), and a spreadsheet listing the names Defendants submitted to caller-identification services for various telemarketing campaigns (Exhibit 49). For the reasons stated below, the court denies Defendants' motion.

### A. The Declaration of Kelly Horne and the Compendium

Defendants contend that Ms. Horne's declaration, the documents attached to the

declaration, and the compendium of script excerpts are inadmissible. First, Defendants argue that the exhibits are not the best evidence under Federal Rule of Evidence 1002. Rule 1002 states, "An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."[2] Further, Rule 1007 states, "The proponent may prove the content of a writing, recording, or photograph by the testimony, deposition, or written statement of the party against whom the evidence is offered. The proponent need not account for the original."[3] Defendants argue that the FTC cannot prove the content of telemarketing calls without the actual recordings. But the FTC is not offering the sample scripts to prove the content of specific calls. Rather, the FTC is using the sample scripts to show the content of a written document (i.e., the sample call scripts). Further, Defendant produced the sample call scripts. Thus, the FTC need not submit the original document and the duplicate is admissible.

Next, Defendants argue that the FTC's exhibits contain inadmissible hearsay. Hearsay is an out-of-court statement introduced to prove the truth of the statement.[4] The sample scripts and related compendium, which is a compilation of snippets from the sample scripts, are not hearsay for two reasons. First, they are statements by a party opponent and thus do not constitute hearsay.[5] Second, the scripts are not being introduced to prove the truth of Defendants' statements. Quite the opposite, the FTC contends that the statements in the scripts are false.

Exhibits 8 and 9 are admissible. Whether the sample scripts are sufficient evidence for summary judgment is addressed below in the discussion on the motions for summary judgment.

## B. The List of Names Submitted to Caller–Identification Services

■ Defendants further argue that the list of names submitted to caller-identification services is inadmissible because the FTC has failed to authenticate the document as required by FRE 901(a). Defendants also claim that they did not see the document until after discovery ended. The document is a self-authenticating business record under FRE 803(6) and FRE 902(11). The FTC received the document from Manchester Services, Inc., which has certified that the record was kept as part of a regularly conducted business activity. Also, the FTC produced the document and identified Manchester Services, Inc. and its agent responsible for producing the document in its initial disclosures. Exhibit 49 is admissible.

## II. Defendants' Motion to Strike Phone Record Analysis

Defendants also filed a motion in limine to exclude the FTC's undisclosed analysis of phone records. But the FTC has not disclosed the analysis, leaving nothing to exclude. For this reason, along with the reasons stated on the record at the January 16, 2014 hearing, Defendants' motion is denied.

### DISCUSSION ON MOTIONS FOR SUMMARY JUDGMENT

## I. Standard of Review

■ Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6]

---

2. FED.R.EVID. 1002.

3. FED.R.EVID. 1007.

4. FED.R.EVID. 801(c).

5. FED.R.EVID. 801(d)(2).

6. FED.R.CIV.P. 56(a).

The court may grant summary judgment on each claim or defense or on part of each claim or defense.[7] The court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party."[8] Importantly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[9]

## II. Counts 1 and 2: Deceptive Representations and Truth in Telemarketing

■ The FTC's first two causes of action are for misleading representations. The first count alleges that Defendants made deceptive statements in violation of Section 5(a) of the FTC Act,[10] which prohibits a practice that "entails a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances."[11] Courts often refer to the Section 5(a) standard as the reasonable-consumer standard. The first count also alleges that Defendants violated various provisions of the Telemarketing Sales Rule (TSR), codified at 16 C.F.R. pt. 310. The second count alleges that Defendants made false statements in connection with telemarketing to induce charitable contributions in violation of the TSR.

### A. First Amendment Defense

■ Defendants argue that the FTC's causes of action based on the FTC Act and the TSR impermissibly limit protected speech. It is well established that "[t]he First Amendment protects the right to engage in charitable solicitation."[12] It is also well established that the First Amendment does not protect fraud, including fraudulent statements in charitable solicitations.[13]

Defendants contend that the First Amendment bars the FTC's enforcement action because it is not based on fraud. In other words, Defendants assert that the only way the FTC can restrict their charitable solicitations at issue is to prove that they committed fraud. Defendants base this argument on a line of Supreme Court cases dealing with restrictions on charitable solicitations. In *Village of Schaumburg v. Citizens for a Better Environment*,[14] *Maryland v. Joseph H. Munson Co.*,[15] and *Riley v. National Federation of the Blind of North Carolina*,[16] the Court considered three prophylactic laws that limited charitable solicitations. Each of the statutes placed a limit on the percentage of charitable contributions professional fundraisers could retain.[17] The Court struck down each statute, holding that laws limiting charitable speech based on the percentage paid toward fundraising

---

7. *Id.*

8. *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir.2008).

9. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

10. 15 U.S.C. § 45(a)(1).

11. *F.T.C. v. LoanPointe, LLC*, 525 Fed.Appx. 696, 700 (10th Cir.2013).

12. *See Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 611, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003).

13. *See id.* at 612, 123 S.Ct. 1829.

14. 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).

15. 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984).

16. 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).

17. *Riley*, 487 U.S. at 786–87, 108 S.Ct. 2667; *Munson*, 467 U.S. at 950–51, 104 S.Ct. 2839; *Village of Schaumburg*, 444 U.S. at 622, 100 S.Ct. 826.

were not narrowly tailored.[18] Put simply, the percentage paid to fundraisers was not "an accurate measure of fraud."[19]

After striking down the three laws, the Court once again considered limitations to charitable solicitations in *Illinois ex rel. Madigan v. Telemarketing Associates*.[20] The Court faced the issue of whether Illinois could bring fraud claims against a telemarketing company that solicited contributions on behalf of a charitable organization that aided Vietnam veterans.[21] The Court found that *Schaumburg, Munson,* and *Riley* left room for "fraud actions to guard the public against false or misleading charitable solicitations."[22] "[T]here are differences critical to First Amendment concerns between fraud actions trained on representations made in individual cases and statutes that categorically ban solicitations when fundraising costs run high."[23] In sum, the Court found that Illinois could bring its fraud claims because they focused on the content of the telemarketers' representations rather than on the percentage of proceeds the telemarketers retained.[24]

Defendants contend that *Madigan* established that the FTC can restrict charitable solicitations only if they are fraudulent, meaning the FTC cannot bring claims based on the Section 5(a) reasonable-consumer standard or other standards in the TSR. The FTC, on the other hand, maintains that *Madigan* stands for the proposition that the government can bring enforcement actions that focus on the content of the telemarketers' representations rather than on the percentage paid toward fundraising. Thus, the FTC argues, *Madigan* did not limit enforcement actions to fraud, but left the door open to enforcement actions based on other causes of action as long as they focused on the content of the solicitations.

■ Whether the FTC asserts fraud in this action is not dispositive. Of course, an action based on fraud likely would not be amenable to a First Amendment defense. But that does not mean that the FTC's only recourse is a fraud action. Charitable solicitations, like other types of protected speech, are subject to limitations that pass constitutional muster.[25] A limitation on charitable speech will be sustained if (1) it "serves a sufficiently strong, subordinating interest that the [government] is entitled to protect" and (2) it is "narrowly drawn ... to serve those interests without unnecessarily interfering with First Amendment freedoms."[26]

■ Accordingly, the FTC's election not to assert fraud does not by itself warrant dismissal of the FTC's first and second causes of action. Rather, the court would to need analyze the causes of action under the applicable constitutional analysis to determine whether the First Amendment prohibits the claims. Defendants have the burden of proving their First Amendment affirmative defense.[27] Because Defen-

---

18. *Riley,* 487 U.S. at 797–800, 108 S.Ct. 2667; *Munson,* 467 U.S. at 949–50, 104 S.Ct. 2839; *Village of Schaumburg,* 444 U.S. at 637, 100 S.Ct. 826.

19. *Munson,* 467 U.S. at 967 n. 16, 104 S.Ct. 2839.

20. 538 U.S. 600, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003).

21. *Id.* at 605, 123 S.Ct. 1829.

22. *Id.* at 617, 123 S.Ct. 1829.

23. *Id.*

24. *Id.*

25. *Vill. of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 632–33, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).

26. *Id.* at 636–37, 100 S.Ct. 826.

27. *See, e.g., Tiscareno v. Frasier,* No. 2:07–CV–336, 2012 WL 1377886, at *14 (D.Utah Apr. 19, 2012); *Mason v. Brigham Young Univ.,*

dants have not squarely presented the applicable constitutional analysis in their briefing (i.e., whether the enforcement action is narrowly drawn to serve a sufficiently strong, subordinating interest), the court declines to grant summary judgment on the First Amendment defense. The remaining issue is whether there is a genuine dispute of material fact regarding the FTC's first and second causes of action.

## B. Legal Standards

### (1) The Reasonable–Consumer Standard

The FTC's first cause of action is that Defendants violated Section 5(a), as well as various TSR provisions. The parties' summary judgment motions focus on the allegedly false statements made in violation of the reasonable-consumer standard. Thus, the court does not address the other allegations in the first cause of action.

The Section 5(a) reasonable-consumer standard prohibits a practice that "entails a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances."[28] The primary purpose of Section 5 is to protect the consumer, and "the 'cardinal factor' in determining whether an act or practice is deceptive under § 5 is the likely effect the promoter's handi-

work will have on the mind of the ordinary consumer."[29] The Tenth Circuit instructs that "[b]ecause the primary purpose of § 5 is to protect the consumer public rather than to punish the wrongdoer, the intent to deceive the consumer is not an element of a § 5 violation."[30] Further, "[n]either proof of consumer reliance nor consumer injury is necessary to establish a § 5 violation."[31]

In determining whether a statement is material and likely to mislead a reasonable consumer, the court looks to the FTC's interpretation of the statute, along with other cases applying the standard. The Supreme Court has pointed out that the FTC Act "necessarily gives the Commission an influential role in interpreting § 5 and in applying it to the facts of particular cases arising out of unprecedented situations."[32] The FTC has determined that a material statement is one that "is likely to affect the consumer's conduct or decision with regard to a product or service."[33] A number of courts have applied this same definition.[34] Further, materiality is presumed for express claims,[35] which are claims that "directly state the representation at issue."[36]

The next question is whether a material misrepresentation is likely to mislead a reasonable consumer. The FTC

No. 2:06–CV–826 TS, 2008 WL 312953, at *1 (D.Utah Feb. 1, 2008).

28. *F.T.C. v. LoanPointe, LLC*, 525 Fed.Appx. 696, 700 (10th Cir.2013).

29. *F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir.2005).

30. *Id.* at 1202.

31. *Id.* at 1203.

32. *F.T.C. v. Colgate–Palmolive Co.*, 380 U.S. 374, 385, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965).

33. *Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 1984 WL 565319 at *45 (1984).

34. *See, e.g., Novartis Corp. v. F.T.C.*, 223 F.3d 783, 786 (D.C.Cir.2000); *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994); *Kraft, Inc. v. F.T.C.*, 970 F.2d 311, 322 (7th Cir.1992); *F.T.C. v. LoanPointe, LLC*, No. 2:10–CV–225DAK, 2011 WL 4348304, at *5 (D.Utah Sept. 16, 2011).

35. *Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 1984 WL 565319 at *49.

36. *In the Matter of Thompson Med. Co., Inc.*, 104 F.T.C. 648, 1984 WL 565377 at *102 (1984).

has explained the following about a reasonable consumer: "To be considered reasonable, the interpretation or reaction does not have to be the only one. When a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation. An interpretation will be presumed reasonable if it is the one the respondent intended to convey."[37] Put differently, the FTC carries its burden of showing that a statement is likely to mislead a reasonable consumer by proving that at least one reasonable interpretation of the statement contains false information. This approach has been deemed the falsity theory.[38]

### (2) Making False Statements in Connection with Telemarketing

The FTC's second cause of action alleges that Defendants violated the TSR by making false statements during telemarketing calls. The FTC alleges that Defendants violated Sections 310.3(a)(4), 310.3(d)(1), 310.3(d)(3), and 310.3(d)(4) of the TSR. Section 310.3(a)(4) prohibits "[m]aking a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution."[39] Sections 310.3(d)(1), (3), and (4) prohibit "any telemarketer soliciting charitable contributions to misrepresent, direct-ly or by implication, any of the following material information: (1) The nature, purpose, or mission of any entity on behalf of which a charitable contribution is being requested;" "(3) The purpose for which any charitable contribution will be used;" and "(4) The percentage or amount of any charitable contribution that will go to a charitable organization or to any particular charitable program." These subsections do not have an intent requirement, and a violation of the TSR constitutes a violation of Section 5(a).[40]

### C. Alleged Misrepresentations During the FOP and Firefighter Charitable Organization Campaigns

Defendants contend that the FTC's claims based on the reasonable-consumer standard and the TSR fail because the statements at issue were accurate.

### (1) Statements that Do Not Warrant Summary Judgment

The FTC submits sample call scripts to prove that Defendant C4C made a number of misleading statements during the FOP and Firefighter Charitable Foundation campaigns. The parties have moved for summary judgment regarding various statements. The table below summarizes the statements that do not warrant summary judgment.

| The FTC | Defendants | Both Parties |
|---|---|---|
| **Bulletproof Vests:** The FTC alleges that C4C made misrepresentations regarding the purchase of bulletproof vests. The sample call scripts state that the contributions to the Florida FOP would be used to provide "supplies like bulletproof vests" for Florida officers when in fact the | **Specific Percentages:** Defendants contend that there is no factual support for the FTC's allegation that Defendants told consumers that "a specific percentage of every contribution goes to fund law enforcement training, death benefits, and assistance to families of officers killed in the line of | **Budgeting:** During multiple FOP campaigns, the FTC alleges that C4C stated during follow-up calls that pledged contributions—as opposed to contributions already paid—were already budgeted for charitable purposes. The FTC alleges that these statements were misleading |

---

37. *Matter of Cliffdale Assocs., Inc.,* 103 F.T.C. 110, 1984 WL 565319 at *47.

38. *See, e.g., F.T.C. v. Pantron I Corp.,* 33 F.3d 1088, 1096 (9th Cir.1994); *F.T.C. v. Nat'l Urological Grp., Inc.,* 645 F.Supp.2d 1167,

1190 (N.D.Ga.2008); *F.T.C. v. QT, Inc.,* 448 F.Supp.2d 908, 959–60 (N.D.Ill.2006).

39. 16 C.F.R. § 310.3.

40. 15 U.S.C. §§ 57a(d)(3), 6102(c).

FOP did not do so.

duty." The FTC submitted one of Defendants' call scripts that stated specific percentages went directly to the FOPs. Further, the FTC presents a call script that stated, "Okay, well in addition to helping officers keep us safe 27% of the gross revenues from donations go to the charitable organization for things like providing funding for law enforcement training, as well as death benefits and ongoing assistance for the families of Connecticut police officers killed in the line of duty."

and that the organization did not actually include pledged donations in their budget. Defendants counter by presenting evidence that the charitable organizations maintained a budget based on the anticipated contributions.

**Amount Retained by C4C:** The FTC contends that C4C misrepresented to consumers the amount of their contribution that would be used for charitable activities. Specifically, C4C's scripts stated that "any support you can give goes" to charitable programs. The FTC contends that these statements were misleading because they failed to mention that C4C retained a significant amount of the contributions.

**Law-Enforcement Training:** The FTC contends that C4C made misrepresentations when it told consumers that contributions would be used to pay for law-enforcement training. The FTC argues that those representations were misleading because the contributions were not used to train police officers on daily law-enforcement activities.

**Administrative Costs:** The FTC alleges that C4C misrepresented the amount of contributions that would be used for administrative costs. C4C's scripts state that such costs would be "very minimal." The FTC argues that these statements were misleading because, in reality, C4C retained a majority of contributions.

**Percentage Doubled:** The FTC contends that C4C made misleading representations concerning the percentage of donations retained by the FOPs and the Firefighters Charitable Foundation. Also, the FTC claims that Defendants made misleading representations by stating that the percentage of contributions retained by the FOPs and the Firefighters Charitable Foundation had doubled.

To prove liability, the FTC must show that Defendants made material misrepresentations.[41] Without proof that Defendants actually made the above statements to consumers, the FTC cannot prove liability under Section 5(a) or the relevant TSR provisions. The FTC submitted sample call scripts as its sole evidence to argue that the above statements were misleading. During the FTC's investigation, it asked Defendants to produce the written scripts used during the telephone calls. Defendants responded that they could not provide written scripts because their employees had various prerecorded snippets they could play, making each conversation different. Defendants then produced prerecorded snippets with the keystroke data of 317,000 conversations. At the FTC's insistence, Defendants then produced sample scripts con-

**41.** *F.T.C. v. LoanPointe, LLC,* 525 Fed.Appx. 696, 700 (10th Cir.2013); *F.T.C. v. Freecom* *Commc'ns, Inc.,* 401 F.3d 1192, 1203 (10th Cir.2005); *see also* 16 C.F.R. § 310.3(a)(4).

taining examples of snippets used during campaigns.

■ Defendants have continuously maintained—in document productions, declarations, motions, and at oral argument—that the sample scripts are not accurate representations of actual conversations. The telemarketers conducting the campaigns at issue use keyboard commands to play various snippets. Although the produced written scripts may reflect some of the snippets the telemarketers could play, they do not prove that Defendants actually made the statements to consumers. Further, the snippets do not provide context to conversations between telemarketers and consumers. The FTC is not required to prove that individual consumers relied on Defendants' statements. But it must prove that Defendants made the statements to consumers.

To find the FTC's proffered evidence sufficient, the court would have to infer that Defendants made the statements based on the fact that the statements are in the sample call scripts. Yet Defendants assert that the sample scripts do not reflect actual conversations but rather a possibility of snippets that telemarketers could have used.

On the other hand, to grant summary judgment in favor of Defendants for the statements regarding budgeting and law-enforcement training, Defendants must show that they did not make the statements or that the statements were true. By moving for summary judgment on some of the statements, Defendants assume the burden. And although the FTC has not shown that Defendants made the calls, Defendants have not shown that they did not make the calls. As stated, the sample scripts create a factual dispute as to whether Defendants made the statements to consumers as part of the telemarketing campaigns. While the fact dispute works in favor of Defendants as opponents of the FTC's summary judgment motions, it works against them as proponents of their own motions. What's more, the FTC presents evidence that the statements were false, leaving a factual dispute regarding the statement's accuracy.

There is a genuine dispute as to whether Defendants actually made the statements. And the court cannot engage in factual inquiries reserved for the jury. Summary judgment is inappropriate for the statements listed above.

### (2) Statements that Warrant Summary Judgment

Defendants assert that the statements below are not misrepresentations. Unlike the statements above, the dispute is not whether Defendants actually made the statements. Rather, the dispute is whether the statements are true. Even if Defendants made the statements, they would not be liable if the statements were true.

### (a) Statements Regarding the Firefighter Charitable Foundation's Budgeted Pledged Contributions

■ Defendant C4C's sample scripts related to the Firefighters Charitable Foundation campaigns stated that pledged contributions—as opposed to contributions actually paid—were already budgeted for charitable purposes. The FTC alleges that these statements were misleading and that the Foundation did not actually include pledged donations in its budget. Defendants counter by presenting evidence that the charitable organizations maintained a budget based on the anticipated contributions.

The Foundation's representative testified in a deposition that the Foundation considers the pledges when planning how to pay for various projects. The FTC does not put forward any specific evidence to rebut this. Based on the evidence submit-

ted, the court concludes that summary judgment is appropriate in favor of Defendants for calls related to pledge budgeting in connection with the Firefighters Charitable Foundation.

### (b) Statements Regarding Immediate Payments

■ The FTC alleges that Defendants misled potential donors by stating that if the potential donor paid over the telephone with a credit card, more of the contribution would go directly to the charitable organization instead of to administrative costs to send out pledge sheets. Defendants argue that they would have incurred additional administrative costs if required to spend the time and expense of mailing the actual pledge sheets. The FTC does not put forth any further evidence that these statements were false. The court thus grants summary judgment in favor of Defendants on these statements.

### D. Evidence of Consumer Deception or Harm During the FOP and Firefighter Charitable Foundation Campaigns

Defendants argue that there is no evidence that consumers were deceived or actually suffered harm. But "[n]either proof of consumer reliance nor consumer injury is necessary to establish a § 5 violation."[42] Certainly the FTC need not present evidence that each consumer who heard a material misrepresentation was actually misled and injured. Such an approach would run contrary to the purpose of an FTC enforcement action, which is designed to remedy widespread harm.[43] Further, the standards at issue do not require proof that individual consumers misperceived the message or were harmed. Section 5(a) liability exists if Defendants made material misrepresentations or omissions that would likely mislead a reasonable consumer.[44] The inquiry thus focuses on a reasonable consumer rather than on individual consumers who received the call. Summary judgment in favor of Defendants is inappropriate on this issue.

### E. Alleged Misrepresentations During the Kids First Campaign

The FTC contends that Defendants made false statements during the Kids First telemarketing campaign. Feature Films made calls on behalf of the Coalition for Quality in Children's Media, which ran the Kids First program. During the campaign, telemarketers would call potential donors and ask them if they would be willing to volunteer in helping the organization make a recommended viewing list of family-friendly movies. If the potential donors agreed to volunteer, they would receive two DVDs for free, watch the DVDs, and provide feedback in a follow-up call. During the follow-up call, Feature Films would offer for sale additional DVDs and state that "all proceeds of this fundraiser will help us finish creating this recommended viewing list." Pursuant to the agreement between Feature Films and Coalition for Quality, Defendant Feature Films would receive up to 93% of the fundraising proceeds. Unlike the FOP and Firefighter Charitable Organization campaigns, the FTC submitted evidence that Defendants made the statements at issue.

■ It is well established that the amount of fundraising proceeds retained by the fundraiser does not bear on Section 5(a) or TSR liability. The FTC, however, has alleged that the content of Defendants' telemarketing messages was deceptive. The FTC does not contend that the per-

---

**42.** *Freecom Commc'ns,* 401 F.3d at 1203.

**43.** *Id.*

**44.** 15 U.S.C. § 45(a)(1); *LoanPointe,* 525 Fed. Appx. at 700.

centage retained by Feature Films by itself leads to liability. Thus, the issue is whether telling a consumer that "all proceeds" would go to the charitable project when up to 93% went to the fundraiser is misleading. Defendants contend that all proceeds went directly to Coalition for Quality, which then paid Defendants for fundraising costs pursuant to the parties' contract.

It is unclear whether a reasonable consumer would interpret the word "proceeds" as meaning the net or gross amount of contributions. And the court declines to substitute its own analysis for the jury's on a fact issue. The court declines to grant summary judgment regarding Defendants' statements during the Kids First campaign.

## III. Counts 3 and 4: Violations of the Do–Not–Call Registry and Entity–Specific Do–Not–Call Requests

### A. National Do–Not–Call Registry

In 2003, the FTC established the National Do–Not–Call Registry. Individuals have the option of placing their telephone numbers on the registry. Section 310.4 of the TSR prohibits telemarketers from calling those registered numbers. Nearly 200 million telephone numbers are on the registry. Telemarketing companies must screen their calls to ensure they do not make outbound calls to registered numbers. Defendants have downloaded the registry since 2003. The FTC alleges that Defendants made calls to phone numbers on the registry in both the Kids First and *Velveteen Rabbit* campaigns.

### (1) Kids First

It is undisputed that Defendants called numbers on the Do–Not–Call Registry during the Kids First Campaign. Defen-

dants argue that the phone calls were exempt from the TSR rules governing the Do–Not–Call Registry.

**Exemption under Section 310.6(a):** Section 310.4(b)(1)(iii)(B) of the TSR states, "It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in, the following conduct ... [i]nitiating any outbound telephone call to a person when ... [t]hat person's telephone number is on the 'do-not-call' registry....:" [45] The Telemarketing and Consumer Fraud and Abuse Prevention Act (the Telemarketing Act), under which the FTC enacted the regulations governing the Do–Not–Call Registry, defines telemarketing as "a plan, program, or campaign which is conducted to induce purchases of goods or services by use of one or more telephones and which involves more than one interstate telephone call." [46]

Defendants' initial call to consumers did not solicit sales, but rather sought volunteers to view and provide feedback on family-friendly films. But during the second call, which invariably came if the consumer agreed to volunteer, Defendants sought sales of additional DVDs. The combination of the first and second call constitutes a "plan, program, or campaign" that seeks to induce sales. Therefore, the first and second calls of the Kids First campaign are governed by Section 310.4(b)(1)(iii)(B).

Defendants contend that the calls were exempt from the regulation under Section 310.6(a) of the TSR. Section 310.6(a) exempts from Section 310.4(b)(1)(iii)(B) "[s]olicitations to induce charitable contributions via outbound telephone calls." [47] Defendants argue that the

**45.** 16 C.F.R. § 310.4(b)(1)(iii)(B).

**46.** 15 U.S.C. § 6106(4).

**47.** 16 C.F.R. § 310.6(a).

first set of calls was issue advocacy and solicitation for volunteers and that the second set of calls was issue advocacy and solicitations for charitable donations.

The issue is whether soliciting volunteers and then offering DVDs in exchange for money constitutes "solicitations to induce charitable contributions" under the TSR. Section 310.2(f) defines charitable contribution as "any donation or gift of money or any other thing of value." [48] The ordinary meaning of donation is "a free contribution." [49] It is a synonym for a gift.[50] A gift is defined as "something voluntarily transferred by one person to another without compensation." [51] Defendants contend that they were soliciting charitable donations and that the DVDs were a "symbolic (and highly germane) incentive" to donate. Yet the call scripts paint a different picture. During the second calls, Defendants used scripts centered on selling DVDs. The script for the second call was labeled "Sales Script." Further, the script discouraged mere donations and instead pushed DVD sales. If a consumer asked if they could donate rather than buy a DVD, the script's response stated, "What wed [sic] rather do, is instead of having you send us a donation, is to buy the films and then donate them to a church, school, or a family. That way you can support the cause and help your community at the same time. Would that be ok?" [52] The rest of the script also supports the notion that the second call was designed to sell DVDs, not merely solicit donations. Although the campaign's purpose was to raise money for a charity, the solicitations do not fall under the plain meaning of charitable contribution as defined by the TSR.

**Established Business Relationship:** Section 310.4(b)(1)(iii)(B)(ii) of the TSR allows telemarketers to call consumers whose numbers are registered in the Do-Not-Call Registry if the telemarketer has "an established business relationship with [the consumer], and that person has not stated that he or she does not wish to receive outbound telephone calls." The TSR defines an established business relationship as "a relationship between a seller and a consumer based on: (1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the eighteen (18) months immediately preceding the date of a telemarketing call; or (2) the consumer's inquiry or application regarding a product or service offered by the seller, within the three (3) months immediately preceding the date of a telemarketing call." [53]

The first call of the Kids First campaign did not create an established business relationship. Rather, it solicited volunteers to watch and review films. By the second call, the potential donor had not purchased, rented, or leased goods from Defendants. Further, the potential donor had not made an inquiry regarding Defendants' business. Quite the opposite, Defendants had reached out to the potential donor in the first instance. The estab-

---

**48.** *Id.* at § 310.2(f).

**49.** Merriam-Webster's Collegiate Dictionary 371 (11th ed.2003).

**50.** *Id.; see also* Black's Law Dictionary 595 (10th ed.2014).

**51.** Merriam-Webster's Collegiate Dictionary 528; *see also* Black's Law Dictionary 803.

**52.** Unlike the FOP and Firefighter Charitable Foundation sample sales scripts, Defendants do not dispute that they made the statements contained in the Kids First script. *See* Kids First Sales Script 3 (Dkt. 98, exh. 14); Letter from Dan McInnis to the FTC (Dkt. 98, exh. 17), at 4.

**53.** 16 C.F.R. § 310.2(*o* ).

lished-business-relationship exception does not apply to the Kids First campaign. Thus, Defendants violated the applicable regulations by calling numbers on the registry. The court grants summary judgment in favor of the FTC on liability under Section 310.4(b)(1)(iii)(B).

**Intent:** Defendants argue that the FTC cannot seek civil penalties without showing that Defendants intentionally violated the Do–Not–Call regulations. Under Section 18(d)(3) of the FTC Act [54] and Section 3(c) of the Telemarketing Act,[55] a violation under the TSR constitutes an unfair or deceptive act in violation of Section 5(a) of the FTC Act. The FTC can seek civil penalties for violation of Section 5(a) if a defendant's violation was "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." [56] Defendants point out that this language leaves open the possibility of a mistake-of-law or mistake-of-fact defense. To support this argument, Defendants cite *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA,*[57] where the Supreme Court distinguished the Fair Debt Collection Practices Act's (FDCPA) civil-liability provision from the FTC Act's provision.[58] The former requires intent while the latter requires actual knowledge or knowledge fairly implied on the basis of objective circumstances.[59] The Court found that under the FDCPA civil-penalty provisions, a person can commit an intentional act even though the person did not know the act was illegal.[60] Under the FTC Act, however, the person must have actual or implied knowledge that the act is unfair or deceptive in violation of federal law.[61]

■■■ Thus, the question becomes whether Defendants had actual or implied knowledge of the violation. The FTC points the court to evidence that Defendants were aware of the law—they downloaded the registry and implemented a policy to prevent making calls to numbers in the registry. Defendants argue that their awareness of the registry and their policy proves that they made a good-faith effort to comply with the law. Also, Defendants argue in various parts of their briefing that the Kids First campaign was not subject to the TSR regulations. In the end, the issue of whether Defendants had actual or implied knowledge that their calls during the Kids First campaign violated the FTC Act and the TSR is disputed. The court reserves for trial the issue of whether the FTC may obtain civil penalties.

### (2) *Velveteen Rabbit*

The *Velveteen Rabbit* campaign involved cold calls to the general public. Defendants called phone numbers in the areas where the film was being released, including numbers on the Do–Not–Call Registry. The scripts for these calls promoted the film and induced consumers to purchase tickets. Some calls stated that consumers who attended the movie would receive credit to purchase additional DVDs. Other calls stated that the producers would give consumers a free DVD if they did not enjoy the movie. Defendants contend that the phone calls were informational rather

---

54. 15 U.S.C. § 57a(d)(3).

55. 15 U.S.C. § 6102(c).

56. 15 U.S.C. § 45(m)(1)(A).

57. 559 U.S. 573, 130 S.Ct. 1605, 176 L.Ed.2d 519 (2010).

58. *Id.* at 583–84, 130 S.Ct. 1605.

59. *Id.*

60. *Id.*

61. *Id.*

than sales calls. The court disagrees. The calls were aimed at selling movie tickets and thus fit squarely within the Do–Not–Call regulations. Defendants nevertheless raise two defenses.

**Exemption:** Defendants argue that the calls were advocacy speech that constitute nothing more than informational calls and not telemarketing. But calls advocating ticket sales are commercial in nature. The TSR's Do–Not–Call provisions apply to "a plan, program, or campaign which is conducted to induce purchases of goods or services, or a charitable contribution, donation, or gift of money or any other thing of value, by use of one or more telephones and which involves more than one interstate telephone call." [62] The fact that callers did not consummate sales during the phone calls does not remove the calls from the TSR. The purpose of the calls was to induce the sale of movie tickets. Therefore, they are governed by the TSR. The court grants summary judgment in favor of the FTC on liability under Section 310.4(b)(1)(iii)(B).

**Intent:** Similar to the Kids First calls, Defendants argue that they had a good-faith belief that the calls constituted protected speech not subject to the TSR, meaning that the FTC cannot obtain civil penalties even if there is liability under the TSR. As stated, whether Defendants had actual or implied knowledge is disputed and therefore reserved for the jury.

### B. Internal Do–Not–Call List

Under Section 310.4(b)(1)(iii)(A) of the TSR, a telemarketer engaged in charitable solicitation on behalf of a nonprofit must maintain a list of individuals who state that they do not wish to receive calls "made on behalf of the charitable organization for which a charitable contribution is being solicited." [63] Telemarketers cannot make future calls to numbers on the internal do-not-call list. [64] The FTC alleges that Defendants violated this provision.

### (1) Kids First

 The FTC has submitted evidence, including a number of consumer complaints, that shows C4C called numbers during the Kids First campaign after consumers asked to be placed on the do-not-call list. Defendants argue that the calls fall under the safe-harbor affirmative defense.

Under Section 310.4(b)(3) of the TSR, a telemarketing company is not liable for violating Section 310.4(b)(1)(iii) if it can demonstrate that it (1) has established and implemented written procedures to comply with the do-not-call regulations; (2) trained its personnel in these procedures; (3) maintains an entity-specific internal do-not-call list; (4) uses a process to prevent telemarketing to numbers on this list; (5) monitors and enforces compliance with the procedures; and (6) proves any subsequent call otherwise violating Section 310.4(b)(1)(iii) is a result of error. [65]

Defendants put forth evidence that they maintain an internal do-not-call list and train their employees about placing phone numbers on the list and avoiding future calls to the listed numbers. Yet, the FTC puts forth evidence that Defendants made thousands of calls to listed numbers during the Kids First and *Velveteen Rabbit* campaigns. The conflicting evidence makes it unclear whether Defendants properly trained telemarketers and whether the calls were a result of error. On the one hand, evidence of Defendants' procedures and training indicates that any calls to

---

**62.** 15 U.S.C. § 6106(4).

**63.** 16 C.F.R. § 310.4(b)(1)(iii)(A).

**64.** *Id.*

**65.** *Id.* at § 310.4(b)(3).

listed numbers were a result of error. On the other hand, the large number of calls to listed numbers indicates that Defendants did not properly implement the required procedures or that the calls were not a result of error. The court reserves for trial the question of whether the safe-harbor defense applies.

### (2) The Velveteen Rabbit

The FTC also alleges that Feature Films violated Section 310.4(b)(1)(iii)(A) during the *Velveteen Rabbit* campaign. Defendants once again argue that the *Velveteen Rabbit* calls were advocacy calls and not subject to the TSR. As stated above, that argument fails. Next, Defendants contend that Feature Films' internal do-not-call list did not apply to the *Velveteen Rabbit* campaign because that campaign was on behalf of the producers.

Defendants' argument is well taken. Under Section 310.4(b)(1)(iii) of the TSR, a company violates the internal do-not-call rules by initiating an outbound call to "a person [who] previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered or made on behalf of the charitable organization for which a charitable contribution is being solicited." [66] During the Feature Films campaigns, the company made advocacy calls and offer family-friendly DVDs for sale. During the *Velveteen Rabbit* campaign, Feature Films were offering the sale of movie tickets on behalf of the film's producers. Therefore, the people who had previously put their numbers on the Family Features do-not-call list would not be on the *Velveteen Rabbit* do-not-call list because the latter campaign was selling a different product (movie tickets) on behalf of a different party (Mr. Baker).

The inquiry does not end there, however. The FTC has submitted individual consumer complaints that Defendants called consumers who had requested that their numbers be placed on the *Velveteen Rabbit* internal do-not-call list. Like the Kids First campaign, Defendants argue that they are protected under the TSR's safe harbor for any calls to numbers on the internal do-not-call list. For the reasons stated above, the court concludes that there is a factual dispute regarding Defendants' safe-harbor defense and the issue is reserved for trial.

## IV. Count 5: Failing to Transmit Information to Caller ID Services

The FTC alleges that Defendants violated Section 310.4(8) of the TSR by failing to transmit its seller name to caller-identification services. Telemarketers violate the rule by "[f]ailing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call." [67] The rule further provides that "it shall not be a violation to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller or charitable organization on behalf of which a telemarketing call is placed, and the seller's or charitable organization's customer or donor service telephone number, which is answered during regular business hours." The upshot is that a telemarketing company must submit its name or the seller's name to the caller-identification services. This "minimal restriction simply allows consumers to screen and ignore telemarking calls." [68]

---

66. 16 C.F.R. § 310.4(b)(1)(iii).

67. 16 C.F.R. § 310.4(8).

68. *Nat'l Fed. of the Blind v. F.T.C.*, 420 F.3d 331, 342 (4th Cir.2005).

 The FTC alleges that Defendants violated the caller-identification rule during the *Velveteen Rabbit* campaign and the Family Feature campaign to sell DVDs. During the *Velveteen Rabbit* campaign, Defendants arranged for "VELVETEEN" or "VELVETEENMOV" to be transmitted to caller-identification services. This violated the plain language of the rule, which requires telemarketers to transmit the seller's name. The terms selected by Defendants are the name of the film, not the name of the seller. Further, Defendants used the terms "CUSTOMER SVC FE" and "FAMILY VALUE CB" during the Feature Films campaign to sell DVDs. These phrases also violated the rule. Defendants could have used "FORREST BAKER," "FAMILY FEATURE," or other appropriate names but failed to do so. The court grants summary judgment on Defendants' liability for violations of Section 310.4(8) of TSR.

## V. Count 6: Failure to Disclose Sales Purpose

Section 310.4(d) of the TSR lays out required oral disclosures that telemarketers must make. The rule states, "It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer in an outbound telephone call or internal or external upsell to induce the purchase of goods or services to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information: (1) The identity of the seller; (2) That the purpose of the call is to sell goods or services; (3) The nature of the goods or services...." [69] The FTC moves for summary judgment on Defendants' alleged violation of the oral-disclosure rule during the *Velveteen Rabbit* and Kids First campaigns.

 The FTC argues that Defendants violated the oral-disclosure rule during the Kids First campaign by stating that Kids First was calling instead of the Coalition for Quality Children's Media. Defendants respond by arguing that the disclosure was sufficient because Kids First is a registered trade name of the Coalition for Quality. But the FTC points out that Kids First is not a trade name, but a certification mark of the Coalition for Quality. Kids First is a mark that signifies the Coalition for Quality's approval. Because Defendants failed to disclose the seller's name, the court grants summary judgment for the FTC.

The FTC further alleges that Defendants violated the oral-disclosure rule during the *Velveteen Rabbit* campaign by failing to disclose the seller's identity and instead stating that they were "calling on behalf of the producers." Although Defendants stated that they were calling on the producers' behalf, they did not disclose the producers' identities. The oral-disclosure rule requires telemarketers to state the "identity of the seller." The rule allows consumers to judge whether to listen to the message and purchase the product and also gives consumers information so they can contact the seller to prevent future calls. Merely stating that the call is on behalf of the producers of *The Velveteen Rabbit* does not give the consumer important information. And although the statement discloses the seller's position, it does not disclose his identity. For example, a telemarketing campaign selling sponges would need to do more than state that the call was on behalf of the sponge retailer. Because Defendants have failed to identify the seller, the court grants summary judgment in the FTC's favor.

## VI. Count 7: Abandoned Calls

Lastly, the FTC moves for summary judgment on its abandoned-calls claims.

---

**69.** 16 C.F.R. § 310.4(d)(1)-(3).

Section 310.4(b)(iv) of the TSR prohibits abandoned calls, which occur when a telemarketer initiates a call, the call is answered by a person, and the telemarketer does not connect the call within two seconds of the person's completed greeting.[70] The parties do not dispute that Defendants made abandoned calls during the Kids First and *Velveteen · Rabbit* campaigns. Defendants argue, however, that both campaigns qualify for the rule's safe harbor.

The rule provides a safe harbor if a telemarketing company employs a technology that ensures that no more than 3% of answered calls are abandoned over each successive thirty-day period of the calling campaign. The telemarketer must also play a recorded message when a sales representative is not available, stating the name and telephone number of the seller. Lastly, the telemarketer must maintain records that establish compliance with the safe-harbor requirements.

 The FTC submits evidence of daily reports that Defendants generated when abandoned call rates exceeded 6%. Defendants counter by arguing that the daily reports did not track abandoned calls for the entire campaigns but rather for a subcategory of campaigns. Defendants and the FTC also submitted multiple statements from Mr. Baker that the abandoned call rate was consistently under 2%. In short, the facts are in dispute. Because the issue of whether the abandoned call rate exceeded 3% is essential to proving or disproving the safe-harbor affirmative defense, the court declines to grant summary judgment and reserves the issue for trial.

## CONCLUSION

For the reasons stated, the court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Partial Summary Judgment on Counts 1 and 2 (Dkt. 38) and the FTC's Motion for Partial Summary Judgment on Liability Regarding the Kids First and *Velveteen Rabbit* Campaigns (Dkt. 98). The court DENIES the FTC's Motion for Partial Summary Judgment on Counts 1 and 2 (Dkt. 89), Defendants' Motion for Partial Summary Judgment on Counts 3 and 4 (Dkt. 39), Defendants' Motion for Partial Summary Judgment on Count 5 (Dkt. 41), Defendants' Motion in Limine (Dkt. 37), and Defendants' Motion to Strike (Dkt. 80). Summary judgment is granted on the following issues:

- Summary judgment is granted in favor of Defendants on the FTC's claim that Defendants made misleading statements regarding the Firefighter Charitable Foundation's practice of including pledged donations in its budget.

- Summary judgment is granted in favor of Defendants on the FTC's claim that Defendants made misleading statements during the FOP and Firefighter Charitable Foundation campaigns regarding decreased administrative costs resulting from immediate payments.

- Summary judgment is granted in favor of the FTC on its claim that Defendants called numbers on the national Do–Not–Call Registry during the Kids First and the *Velveteen Rabbit* campaigns. The calls violated Section 310.4(b)(1)(iii)(B) of the TSR.

- Summary judgment is granted in favor of the FTC on its claim that Defendants failed to properly transmit identifying information to caller-identification services in violation of Section 310.4(8) of the TSR.

- Summary judgment is granted in favor of the FTC on its claim that Defendants · failed to properly disclose the

---

**70.** 16 C.F.R. § 310.4(b)(iv).

sales purpose during the Kids First campaign in violation of Section 310.4(d) of the TSR.

The remaining issues, including injunctive relief and civil penalties, are reserved for trial.