**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**COORGA NUTRACEUTICALS CORP., a corporation, and Garfield Coore, individually and as an officer of COORGA Nutraceuticals Corp., Defendants.**

**Case No. 2:15-CV-0072-SWS**

United States District Court,
D. Wyoming.

Signed August 15, 2016

Andrew Wone, Elizabeth K. Nach, Kristin M. Williams, Phyllis H. Marcus, Sarah Botha, Federal Trade Commission, Washington, DC, Mark A. Klaassen, United States Attorneys Office, Cheyenne, WY, for Plaintiff.

Jeffrey Marc Boldt, The Kuker Group LLP, Cheyenne, WY, for Defendants.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Scott W. Skavdahl, United States District Judge

This matter comes before the Court on the parties' cross motions for summary judgment (ECF Nos. 44, 46). The Court, having carefully considered the briefs and materials submitted in support of the respective motions and the oppositions thereto, and being otherwise fully advised, FINDS and ORDERS as follows:

### BACKGROUND

Plaintiff Federal Trade Commission ("FTC") brought this action under § 13(b) of the FTC Act, 15 U.S.C. § 53(b), for alleged violations of §§ 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, in connection with the labeling, advertising, marketing, distribution, and sale of the Grey Defence dietary supplement that purportedly reverses or prevents the formation of gray hair. (Compl. ¶ 1.) Specifically, the FTC alleges Defendants' representation that Grey Defence reverses or prevents the formation of gray hair is false or misleading, or was not substantiated at the time the representation was made (Count I—False or Unsubstantiated Efficacy), and Defendants' representation that Grey Defence is scientifically proven to reverse or prevent the formation of gray hair is false (Count II—False Proof). *Id.* ¶¶ 17-22.

Defendant COORGA Nutraceuticals Corporation ("COORGA") is a Wyoming corporation. Defendant Garfield Coore owns 65% of COORGA and is its Executive Vice President and sole employee.[1] (Coore 30(b)(6) Dep. 18:8-17; Pl.'s Ex. 6, ¶¶ 1, 3.) Since 2011, Defendants have advertised, marketed, and sold the Grey Defence dietary supplement (and several successive formulations thereof) to consumers throughout the United States. According to the product label, Grey Defence contains a blend of vitamins and minerals, as well as the enzyme catalase.

Coore, a self-described "applied scientist,"[2] developed the Grey Defence formu-

---

1. Craig Poulton owns the remaining 35% interest but is neither a director nor an officer of the company and does not participate in any company decision-making or operations. (Pl.'s Ex. 6, ¶ 3.)

2. (Coore 30(b)(6) Dep. 52:20-21); (Coore Aff. Ex. 1 at 5). Applied science is "the discipline dealing with the art of science of applying scientific knowledge to practical problems." *Definition of applied science,* THE FREE DICTIO-

la over a 9-month period by conducting "comparative scientific research" of various journal articles, studies related to Vitiligo (a disease that causes the loss of skin color),[3] and various "therapeutic compounds." (Coore Aff. Ex. 1, *Summary of Scientific Investigation Leading to the Basic Formulation of Grey Defence)* (ECF No. 45-1). "To make the product bullet proof," Coore conducted further comparative research on the issue of absorption and bioavailability (to "ensure that ingredients in the formulation actually get[ ] into the body in sufficient quantity to do work"), spoke with scientists about their laboratory work unrelated to Grey Defence specifically, and tested the product on himself ("seeing re-pigmentation of some of my own hair follicles after 3 months in the range of around 3%"). *Id.* at 4-5. Coore states additional, unspecified experiments were also conducted, and Defendants ultimately received a US patent for the product. *Id.* at 5. Coore believes his dietary supplement can stop, reverse, and prevent the natural graying of human hair and admits that his product is marketed and advertised on that premise. (Coore Aff. ¶ 8.) Defendants further admit they have represented to consumers that Grey Defence is *scientifically proven* to reverse or prevent the formation of gray hair. (Compl. ¶ 20; Answer ¶ 20.)

Coore obtained undergraduate and graduate degrees in economics; he does not have a medical degree and has not taken any courses in dermatology or pharmacology or, since high school, in chemistry or biology. Id. 11:5-8, 12:1-2, 14:22-15:24, 16:6-12. Coore is COORGA's only employee and fills all roles for the company as needed. (Coore 30(b)(6) Dep. 18:8-25.) Coore participates in and controls COORGA's business activities, including product development, manufacturing, advertising, marketing, sales, customer relations, and financial management. Coore created, developed, approved, and disseminated Grey Defence ads, including the websites as well as radio, television, print, and outdoor ads. Coore decided how much to spend and where to disseminate Grey Defence ads. Coore further created, edited, and approved telemarketing scripts for Grey Defence and selected, trained, monitored, and rewarded through sales incentives COORGA's telemarketers for Grey Defence.

Defendants have disseminated ads for Grey Defence products via radio (including Sirius XM satellite radio and local radio stations throughout the U.S.), television, and the internet. Defendants purchased keywords in Google AdWords like "hair graying prevention," "cure for grey hair," and "how to reverse gray hair." Defendants have further disseminated print and email ads, as well as ads through their product website and social media pages. Consumers purchased the products directly from Defendants through the product website, mobile website, and telephone numbers listed in Grey Defence ads. COORGA has sold Grey Defence for $69.99 per bottle, with discounts given for multi-bottle purchases. From 2011 to June 10, 2016, COORGA had $433,848.93 in gross sales to U.S. consumers. The FTC calculates that COORGA has refunded $29,608.26 to U.S. consumer through June 10, 2016. From 2011 to 2013, COORGA spent $184,599.01 on advertising and marketing of Grey Defence products.

Coore has developed and intends to sell a new product, Grey Defence Xtreme 3.0 (apparently approved by Health Canada), as soon as this case concludes and he has

---

NARY, http://www.thefreedictionary.com/applied+science.

3. http://www.mayoclinic.org/diseases-conditions/vitiligo/basics/definition/con-20032007.

the financial resources to commercialize it. (Coore 30(b)(6) Dep. 86:17-87:6.) Defendants have also developed other products, including brain JOLT!, TumorDefence, FatBLOKKER! (now known as mealBUDDYZ!), Endura, and Sodhalose-C. Defendants have promoted TumorDefence to fight cancer metastasis and tumor growth, including on the website www.indiegogo.com. In advertising TumorDefence, Coore purchased words in Google AdWords like "cure for cancer" and "anti cancer treatments." Defendants have promoted brain-JOLT! to boost working memory, including on the website mybrainjolt.com and www.indiegogo.com. COORGA is developing a health product to fight neurodegenerative diseases, such as Alzheimer's disease, ALS, multiple sclerosis, and Parkinson's disease. One such produce is Sodhalose-C (which Coore asserts is approved by Health Canada). *Id.* 102:25-104:4. As with the Grey Defence products, Coore developed TumorDefence and Sodhalose-C through his own research and review of journal articles and discussions with ingredient suppliers without consulting any medical professionals or scientists. (Coore Dep. 78:15-79:4, 80:14-25.)

The FTC contends Defendants have deceptively advertised that their Grey Defence dietary supplements ("Grey Defence") reverse or prevent the formation of gray hair in humans and are scientifically proven to do so because Defendants had no reliable or relevant scientific evidence to support such claims. Just the opposite, Defendants contend their advertising materials for Grey Defence are neither false nor misleading, and Defendants had a reasonable basis for their claims. The Plaintiff and Defendants have each moved for summary judgment in their respective favor. Because the material facts are largely undisputed, the Court finds summary disposition appropriate in this case.

## STANDARD OF REVIEW

Summary judgment is appropriate where a movant shows "there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a) (2010) (emphasis added). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.,* 649 F.3d 1189, 1194 (10th Cir.2011) (internal quotations and citations omitted).

In reviewing a motion for summary judgment, the Court is to determine whether there is evidence to support a party's factual claim, *Jarvis v. Potter,* 500 F.3d 1113, 1120 (10th Cir.2007), and, in doing so, must view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party, *E.E.O.C. v. C.R. England, Inc.,* 644 F.3d 1028, 1037 (10th Cir.2011). "However, unsupported conclusory allegations do not create a genuine issue of fact." *Id.* (internal quotations and citations omitted).

"The moving party has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law. [T]he movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim. If the movant carries this initial burden, the non-movant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kannady v. City of Kiowa,* 590 F.3d 1161, 1169 (10th Cir. 2010) (internal quotation marks and citations omitted).

## DISCUSSION

 Section 5 of the FTC Act declares unlawful "deceptive acts or practices

in or affecting commerce." 15 U.S.C. § 45(a). "The primary purpose of § 5 is to lessen the harsh effects of *caveat emptor.* Such rule 'can no longer be relied upon as a means of rewarding fraud and deception and has been replaced by a rule which gives to the consumer the right to rely upon representations of facts as the truth.'" *F.T.C. v. Freecom Commc'ns, Inc.,* 401 F.3d 1192, 1202 (10th Cir.2005) (quoting *FTC v. Sterling Drug, Inc.,* 317 F.2d 669, 674 (2d Cir.1963)). "Section 5, consistent with its purpose, requires the FTC to show the business entity made material representations likely to mislead ordinary consumers to their detriment." *Id.* at 1203. *See also FTC v. Tashman,* 318 F.3d 1273, 1277 (11th Cir.2003) ("To establish liability under section 5 of the FTCA, the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material."). "Because the primary purpose of § 5 is to protect the consumer public rather than to punish the wrongdoer, the intent to deceive the consumer is not an element of a § 5 violation." *Freecom Commc'ns,* 401 F.3d at 1202.

Section 12 of the FTC Act makes it unlawful for any person or corporation "to disseminate, or cause to be disseminated, any false advertisement ... for the purpose of inducing, or which is likely to induce ... the purchase of foods, drugs, devices, or cosmetics." 15 U.S.C. § 52(a). A "false advertisement" means an advertisement which is "misleading in a material respect." *Id.* § 55(a)(1). False advertising in violation of Section 12 is a deceptive act or practice in violation of Section 5. *Id.* § 52(b). Accordingly, sections 45 and 52 are often applied in tandem as the basis for deceptive advertising claims. *FTC v. Direct Mktg. Concepts, Inc.,* 624 F.3d 1, 7–8 (1st Cir.2010).

### A. Whether Defendants' Representations Were Misleading

█ The parties' arguments here focus on whether Defendants' representations were likely to mislead consumers. Although Defendants are careful not to concede the other elements of a Section 5 violation, there can be little doubt Defendants made material representations. Defendants undisputedly disseminated radio, television, and internet ads throughout the U.S. with the express claims that Grey Defence prevents and reverses the graying of human hair and is scientifically proven to do so. (*See* Coore Aff. ¶ 9.) Express claims, deliberately implied claims, and claims that "significantly involve health" are presumed material. *Kraft, Inc. v. FTC,* 970 F.2d 311, 322 (7th Cir.1992).

█ The FTC has characterized Count I as an "efficacy" claim and Count II as an "establishment" claim. (*See* Pl.'s Memo. in Supp. of MSJ at 15.) The D.C. Circuit Court of Appeals has recently explained the distinction as follows:

> An efficacy claim suggests that a product successfully performs the advertised function or yields the advertised benefit, but includes no suggestion of scientific proof of the product's effectiveness. *See [Thompson Med. Co. v. FTC,* 791 F.2d 189, 194 (D.C.Cir.1986)]; *Removatron Int'l Corp. v. FTC,* 884 F.2d 1489, 1492 n. 3 (1st Cir.1989). An establishment claim, by contrast, suggests that a product's effectiveness or superiority has been scientifically established. *See Thompson Med. Co.,* 791 F.2d at 194; *Sterling Drug, Inc. v. FTC,* 741 F.2d 1146, 1150 (9th Cir.1984).

The distinction between efficacy claims and establishment claims gains salience at the second step of the Commission's inquiry, which calls for determining whether the advertiser's claim is

false, misleading, or unsubstantiated. If an ad conveys an efficacy claim, the **advertiser must possess a "reasonable basis"** for the claim. *See [In re ] Pfizer Inc.*, 81 F.T.C. 23, 62 (1972). The FTC examines that question under the so-called *"Pfizer* factors," including "the type of product," "the type of claim," "the benefit of a truthful claim," "the ease of developing substantiation for the claim," "the consequences of a false claim," and **"the amount of substantiation experts in the field would consider reasonable."** *Daniel Chapter One*, No. 9329, 2009 WL 5160000, at *25 (U.S.Fed.Trade Comm'n Dec. 24, 2009) (citing *Pfizer*, 81 F.T.C. at 64), *aff'd*, 405 Fed.Appx. 505 (D.C.Cir.2010); *see also Thompson Med. Co.*, 104 F.T.C. at 821.

For establishment claims, by contrast, the Commission generally does not apply the *Pfizer* factors. *See Removatron Int'l Corp.*, 111 F.T.C. 206, 297 (1988), *aff'd*, 884 F.2d 1489 (1st Cir.1989). Rather, the amount of substantiation needed for an establishment claim depends on whether the claim is "specific" or "non-specific." *See Thompson Med. Co.*, 791 F.2d at 194. If an establishment claim "states a specific type of substantiation," the "advertiser must possess the specific substantiation claimed." *Removatron*, 884 F.2d at 1492 n. 3. If an ad instead conveys a non-specific establishment claim—e.g., an ad stating that a product's efficacy is "medically proven" or making use of "visual aids" that **"clearly suggest that the claim is based upon a foundation of scientific evidence"—** the advertiser **"must possess evidence sufficient to satisfy the relevant scientific community of the claim's truth."**

[In The Matter of ]Bristol–Myers Co., 102 F.T.C. 21, 321[220] (1983), *aff'd*, 738 F.2d 554 (2d Cir.1984). The Commission therefore **"determines what evidence would in fact establish such a claim in the relevant scientific community" and " then compares the advertisers' substantiation evidence to that required by the scientific community."** *Removatron*, 884 F.2d at 1498.

*POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490–91 (D.C.Cir.2015), *cert. denied*, —— U.S. ——, 136 S.Ct. 1839, 194 L.Ed.2d 839 (2016) (bold emphasis added).

For both efficacy and non-specific establishment claims, then, like those at issue in this case, it is appropriate to consider the amount of substantiation required by the relevant scientific community in determining whether the advertiser's claim is false, misleading, or unsubstantiated. "Where the advertisers lack adequate substantiation evidence, they necessarily lack any reasonable basis for their claims. And where the advertisers so lack a reasonable basis, their ads are deceptive as a matter of law." *Direct Mktg. Concepts, Inc.*, 624 F.3d at 8 (citation omitted). These substantiation requirements are consistent with FTC guidance to advertisers of dietary supplements. *See "Dietary Supplements: An Advertising Guide for Industry "* at 8-16.[4] The FTC typically requires claims about the efficacy or safety of dietary supplements to be supported with "competent and reliable scientific evidence." *Id.* at 9.[5] "A guiding principle for determining the amount and type of evidence that will be sufficient is what experts in the relevant area of study would generally consider to be adequate." *Id.* at 10.

**4.** Available at https://www.ftc.gov/svstem/files/documents/plain-language/bus09-dietarv-supplements-advertising-guide-industry.pdf.

**5.** *See also FTC v. Nat'l Urological Group, Inc.*, 645 F.Supp.2d 1167, 1190 (N.D.Ga.2008) (cit-

ing *FTC v. QT, Inc.*, 448 F.Supp.2d 908, 961 (N.D.Ill.2006) (in the case of claims concerning efficacy or safety of dietary supplements, a reasonable basis must, at a minimum, consist of competent and reliable scientific evidence).

Defendants represent that "Grey Defence is a leading anti-aging dietary supplement that reverses grey hair." (*See, e.g.,* Compl. Ex. B.) Defendants expressly claim in their ads that the Grey Defence formula is "science based" and the "specific compounds used have been shown to slow, stop and even reverse grey hair." (*See, e.g.,* Compl. Ex. A.) Defendants promote their product as "safe and effective." *Id.* The FTC contends these efficacy and establishment claims lack a reasonable basis because they were false or unsubstantiated.[6] In support, the FTC submits the expert testimony of Dr. George Cotsarelis, a Doctor of Medicine and Professor of Dermatology at the University of Pennsylvania School of Medicine and Director of the Hair and Scalp Clinic at the University of Pennsylvania Health System. (*See* Cotsarelis Decl. ¶ 4.) The FTC asked Dr. Cotsarelis to evaluate, from his perspective as an expert in dermatology, specifically hair, whether the Grey Defence dietary supplements: 1) reverse or prevent the formation of gray hair; or 2) are scientifically proven to reverse or prevent the formation of gray hair in humans. *Id.* ¶ 2.

Dr. Cotsarelis opines that, to substantiate claims that Grey Defence dietary supplements reverse or prevent the formation of gray hair, experts in the field of dermatology, specifically hair, would require at least one well-designed, randomized, placebo-controlled, and double-blinded human clinical trial. *Id.* ¶ 12. "A human clinical trial provides evidence of a causal relationship between the product and the outcome in humans." *Id.* A clinical trial should use an appropriate outcome measure and sample population, and have reliable data collected over an appropriate period of time."

*Id.* Dr. Cotsarelis found no human clinical trials of any Grey Defence dietary supplement demonstrating efficacy in reversing or preventing gray hair. *Id.* ¶ 14. Based upon his review of Defendants' purported substantiation and the relevant scientific literature, the FTC's expert found no competent and reliable scientific evidence to support Defendants' claims. *Id.* ¶ 13.

The Defendants have not countered the testimony of the FTC expert regarding what level of substantiation is required for the claims involved in this case. Accordingly, there is no dispute of fact regarding the requisite level of substantiation and the Court will properly rely on the standard set forth by Dr. Cotsarelis. *See FTC v. Nat'l Urological Group, Inc.,* 645 F.Supp.2d 1167, 1202 (N.D.Ga.2008). While it is true, as Defendants point out, that the FTC's advertising guide suggests there may be other scientific evidence that could be sufficient and that a double-blind study is not *necessarily* required in all instances, the FTC has established that a human clinical trial is required for the claims made by Defendants that its dietary supplements reverse or prevent the graying of human hair. *See FTC v. QT, Inc.,* 512 F.3d 858, 861–62 (7th Cir.2008) (while "a statement that is plausible but has not been tested in the most reliable way cannot be condemned out of hand," an advertiser whose claims are based on new scientific principles must have proof of the product's efficacy).

▪ Defendants challenge the qualifications of Dr. Cotsarelis to make such opinions and insist that Mr. Coore's research sufficiently substantiates their claims regarding Grey Defence's ability to reverse and prevent the graying of human hair. Defendants contend Dr. Cotsarelis'

---

**6.** When determining whether claims are deceptive due to inadequate substantiation, courts should be "mindful of the Commission's 'special expertise in determining what sort of substantiation is necessary to assure that advertising is not deceptive.' " *POM Wonderful,* 777 F.3d 478, 493 (quoting *Thompson Med. Co.,* 791 F.2d at 196).

opinions are unreliable because he has no experience whatsoever with research on human canities (grayness or whiteness of the hair [7]), as compared to Coore's "extensive use of the discipline of applied science" in this area. (*See* Defs.' Resp. in Opp. to Pl.'s MSJ at 8.) First, Coore, a lay witness, cannot provide expert opinions to rebut Dr. Cotsarelis' expert opinions. Federal Rule of Evidence 701 only allows opinion testimony by a lay witness if the testimony is *not* based on scientific, technical, or other specialized knowledge within the scope of Rule 702 (governing testimony by an expert witness). FED.R.EVID. 701(c). *See also James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011) (Federal Rule of Evidence 701 "does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness"). The opinions and conclusions Coore reached from his research relate to matters beyond the realm of common experience and which require scientific, technical, or specialized knowledge. Indeed, the asserted basis of Coore's opinions is the extensive scientific and technical analysis and conclusions of actual scientists.

▮ Accordingly, Coore's opinions may only be admitted under Rule 702. However, Coore was not properly designated as an expert witness pursuant to the Federal Rules of Civil Procedure and does not otherwise qualify as an expert under Federal Rule of Evidence 702. *See* FED. R.CIV.P. 26(a)(2) (disclosure of expert testimony); FED.R.EVID. 702 (witness may testify in the form of an opinion if qualified as an expert by knowledge, skill, experience, training, or education).

·The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science.... But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation— i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Simply reading articles over a nine-month period does not impart the knowledge, skills, experience, training, or education one needs to competently interpret and evaluate scientific journal articles, opine on what constitutes scientific proof, and weigh the evidence related to the cause or prevention of gray hair. Coore's opinions offered as expert testimony amount to nothing more than unsupported, theoretical statements that are inadmissible and insufficient to create a disputed issue of material fact at summary judgment. [8]

---

7. *See* http://www.merriam-webster.com/medical/canities.

8. The Court will consider Mr. Coore's *Summary of Scientific Investigation Leading to the Basis Formulation of Grey Defence* to the extent it contains *factual* information regarding

■ Second, the Court finds Plaintiff's expert, Dr. Cotsarelis, is qualified to provide expert testimony on the substantiation proffered by Defendants to support the challenged claims. As discussed in his report, Dr. Cotsarelis has broad expertise in the biology of human hair through his experiences as a professor of dermatology, a board-certified dermatologist, and Director of the Hair and Scalp Clinic at the University of Pennsylvania Health System. Additionally, he has been involved in several professional associations and scientific organizations related to hair and clinical investigation. Although Plaintiff's expert has not conducted research specifically on gray hair, a witness will be qualified as an expert as long as the witness stays within the reasonable confines of the witness' subject area. *See Vigil v. Burlington Northern and Santa Fe Ry. Co.*, 521 F.Supp.2d 1185, 1204 (D.N.M.2007); *Squires ex rel Squires v. Goodwin*, 829 F.Supp.2d 1041, 1048–49 (D.Colo.2011) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir.2001)). Dr. Cotsarelis' opinions on what experts in the field of dermatology, specifically hair, would require to constitute competent and reliable scientific evidence and whether Defendants' substantiation was sufficient to support the claims made about Grey Defence are within the confines of his subject area.

■ The Court finds Defendants' efficacy claim that Grey Defence reverses or prevents the formation of gray hair is unsubstantiated and, therefore, Defendants lack a reasonable basis for the claim. The studies from Coore's research, while potentially useful in generating hypotheses for future studies, do not establish a causal connection between Grey Defence and a change in gray hair, and thus cannot support the claim that Grey Defence reverses or prevents gray hair in humans. Further, the steps he took and the nature of the articles

Defendants' "Observational Survey" does not provide sufficient substantiation for their advertising claims. The Survey consisted of feedback from twenty Grey Defence users (out of the 100 contacted). It is clear, even to the Court, that the Survey cannot be characterized as a well-designed or controlled scientific study. In his report, Dr. Cotsalrelis discusses the numerous deficiencies in the Survey and states that anecdotal evidence, such as reports from participants, is insufficient to prove a product's efficacy. (Cotsarelis Decl. ¶¶ 16-17.) *See also QT, Inc.*, 512 F.3d at 862 (testimonials "are not a form of proof because most testimonials represent a logical fallacy: post hoc ergo propter hoc," *i.e.*, "[a] person who experiences a reduction in pain after donning the bracelet may have enjoyed the same reduction without it").

■ Regarding the FTC's challenge to Defendants' establishment claims, Defendants argue they only reference their own "Observational Study" as proving their claim that Grey Defence reverses graying of hair (*e.g.* Compl. Ex. A); thus, they "possess the specific substantiation claimed." *See POM Wonderful*, 777 F.3d at 491. This does not assist Defendants, however, because the FTC's Count II focuses on Defendants' non-specific establishment claims that Grey Defence is "based upon a foundation of scientific evidence." *Id.* Defendants' advertisements are replete with statements regarding the scientific basis for Grey Defence and assertions that the compounds used in the formula have been "scientifically shown" to reverse and prevent gray hair. (*See, e.g.*, Compl. Exs. A & B.) As discussed above, the Observational Survey is insufficient substantiation. In any event, Defendants went beyond the Survey when they clearly suggested in their advertising that Grey Defence is scientifically proven to prevent and reverse gray hair, and Defendants have admitted he reviewed in developing Grey Defence.

to making this establishment claim since 2011, well before the self-serving Survey was completed in 2013. The FTC has established that Defendants do not possess evidence "sufficient to satisfy the relevant scientific community of the claim's truth." *POM Wonderful*, 777 F.3d at 491.

### B. Nature of Relief

The undisputed evidence establishes that Defendant COORGA violated Sections 5(a) and 12 of the FTC Act. Section 13(b) of the FTC Act authorizes permanent injunctive relief "in proper cases" where the FTC has presented sufficient proof of a defendant's violation of the FTC Act. 15 U.S.C. § 53(b). "Although § 13(b) does not expressly authorize a court to grant consumer redress (i.e., refund, restitution, rescission, or other equitable monetary relief), § 13(b)'s grant of authority to provide injunctive relief carries with it the full range of equitable remedies, including the power to grant consumer redress. In cases where the FTC seeks injunctive relief, courts deem any monetary relief sought as incidental to injunctive relief." *Freecom Commc'ns*, 401 F.3d at 1202 n. 6.

 "To justify the imposition of injunctive relief against the individual, the FTC is required to show the individual participated directly in the business entity's deceptive acts or practices, *or had the authority to control* such acts or practices." *Id.* at 1204. As discussed above, Coore controls COORGA and is its sole employee. He oversaw and directed every aspect of COORGA's business, including developing the Grey Defence products, creating or approving Grey Defence's advertising and telemarketing sales scripts, and conducting the Survey. This level of participation and control is sufficient to support injunctive relief against Coore individually.

 To establish a right to consumer redress, the FTC must show proof of consumer reliance. *Id.* at 1205. "The FTC is not required, however, to show any particular purchaser actually relied on or was injured by the unlawful misrepresentations[.]" *Id.* Rather, "[t]o raise a presumption of reliance, the FTC need only show (1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products." *Id.* at 1206. To hold an individual personally liable for consumer redress, the FTC must show "the individual had or should have had knowledge or awareness of defendants' misrepresentations." *Id.* at 1207. "The FTC may fulfill its burden by showing the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.*

 The Court finds this is a proper case for injunctive relief. The FTC has demonstrated "there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir.2009) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). Coore has developed and intends to sell a new Grey Defence product as soon as this case concludes, and COORGA has promoted another dietary supplement alleged to prevent cancer metastasis and tumor growth (TumorDefence) and is developing a product to fight neurodegenerative diseases such as Alzheimer's disease, ALS, multiple sclerosis, and Parkinson's disease (Sodhalose-C).

The FTC's proposed injunctive relief would cover false or unsubstantiated claims relating to reversing or preventing gray hair, treating diseases, or the health

benefits, performance, or efficacy of other products. Injunctive relief under the FTC Act may "fence in" offenders by enjoining more than the specific misconduct previously engaged in, "but the injunction must bear a reasonable relation to the unlawful practices found to exist." *Id.* at 1203 (citing *FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 394–95, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965) (internal quotation marks omitted)).

The Court further finds it appropriate to grant the FTC's request for consumer redress. The undisputed evidence establishes that COORGA made material misrepresentations likely to deceive consumers, those misrepresentations were widely disseminated, and consumers purchased COORGA's products. Moreover, it is appropriate to hold Defendant Coore personally liable for consumer redress, because the evidence shows Coore had actual knowledge of COORGA's material misrepresentations or, at the least, showed reckless indifference to the truth or falsity of such misrepresentations. Coore was intimately involved with Grey Defence's development and advertising, yet chose not to consult any medical professional to evaluate his purported substantiation or conduct any well-designed clinical trial to investigate Grey Defence's efficacy. Instead, he arrogantly relied on his own internet research, knowledge from high school biology and chemistry classes, a test on himself, and conversations with researchers who did not actually evaluate Grey Defence's efficacy. This type of evidence constitutes reckless indifference. *See, e.g., FTC v. Wellness Support Network, Inc.*, No. 10–CV–04879–JCS, 2014 WL 644749, at *18 (N.D.Cal. Feb. 19, 2014) (finding the knowledge requirement satisfied because defendant controlled the company, developed the product, and created the advertisements despite having no formal medical or scientific training, relying on his own internet research, and failing to conduct any scientific testing).

CONCLUSION

The FTC is entitled to judgment as a matter of law as there are no genuine disputes of material fact regarding its claims against Defendants for violations of Sections 5(a) and 12 of the FTC Act. The Court further finds both injunctive and monetary relief should be awarded. However, the Court is hesitant to simply order the relief set out in the FTC's *Proposed Final Judgment and Order for Permanent Injunction and Other Equitable Relief* because the extent of appropriate injunctive and monetary relief was not fully addressed in the parties' summary judgment briefing. Accordingly, the Court will direct the parties to confer with one another in an effort to reach agreement as to the terms of any final judgment and order for permanent injunction and consumer redress. If such agreement cannot be reached, the Court will set the matter for further proceedings to determine the extent of injunctive and monetary relief that will be awarded. THEREFORE, it is hereby

ORDERED that *Plaintiff's Motion for Summary Judgment* (ECF No. 46) is GRANTED, and *Defendants' Motion for Summary Judgment Dismissing All Claims Against Defendants* (ECF No. 44) is DENIED; it is further

ORDERED that the parties shall confer with one another in an effort to reach agreement as to entry of a final judgment and order for injunctive and monetary relief. No later than **September 19, 2016,** the parties shall submit either a Stipulated Final Judgment and Order or a report outlining the status of their efforts to reach agreement.